# EXHIBIT 1

Superior Court Of California,
Sacramento
03/17/2022
ddonkin
By_____, Deputy
Case Number:
34-2022-00316963

1  **BUCHALTER**
   **A Professional Corporation**
2  Harry W.R. Chamberlain II (SBN: 95780)
   500 Capitol Mall, Suite 1900
3  Sacramento, CA 95814-4762
   Telephone: 916.945.5170
4  Email: hchamberlain@buchalter.com

5  Cecilia O. Miller (SBN: 211111)
   Zhasmina Kolarova (SBN: 328751)
6  655 West Broadway, Suite 1600
   San Diego, CA 92101
7  Telephone: 619.219.5335
   Email: cmiller@buchalter.com
8         zkolarova@buchalter.com

9  Attorneys for Plaintiff
   VISION SERVICE PLAN
10

11              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

12                       **COUNTY OF SACRAMENTO**

13

14  VISION SERVICE PLAN, a California Not-For-     CASE NO.
    Profit Corporation
15                                                **COMPLAINT FOR:**
          Plaintiff,
16                                                **(1) BREACH OF CONTRACT;**
          v.
17                                                **(2) BREACH OF THE COVENANT OF**
                                                  **GOOD FAITH AND FAIR DEALING**
18                                                **(BAD FAITH);**
    ILLINOIS UNION INSURANCE COMPANY;
19  and DOES 1 through 50, inclusive,             **(3) DECLARATORY RELIEF; AND**

20        Defendants.                             **(4) SPECIFIC PERFORMANCE**

21

22

23

24        COMES NOW, Plaintiff VISION SERVICE PLAN (hereinafter Plaintiff or VSP), and by

25  its undersigned counsel, BUCHALTER, a Professional Corporation, brings this action complaining

26  of Defendants, and each of them, and alleging as follows:

27

28

                                         1

BUCHALTER
A PROFESSIONAL CORPORATION

BN 69085392v4

# SUMMARY OF ACTION

1.      This is an insurance coverage dispute in which Defendant ILLINOIS UNION INSURANCE COMPANY, a member company or affiliate of the Chubb Group Of Insurance Companies (hereinafter referred to as Chubb or Defendant), has failed and refused to pay the full value of Plaintiff's claim for "Loss" arising from multiple "Pollution Conditions" as that term is defined in the Chubb Premises Pollution Liability Insurance Policy arising from the virus now known as the severe acute respiratory syndrome coronavirus 2 and the coronavirus disease it causes (collectively, "COVID-19").  The rapid transmission of COVID-19 in the early part of 2020 caused a global COVID-19 pandemic that forced the suspension of operations across multiple lines of business of Plaintiff, which in turn caused Plaintiff to suffer significant Business Interruption losses and incur First Party Remediation costs as Plaintiff sought to mitigate its damages and safely re-open for business.

2.      As set forth below, Chubb has unreasonably and in bad faith declined to fulfill its insurance coverage obligations owed to VSP as an insured under a "Premises Pollution Liability Insurance Policy" identified as Policy No. PPL G71469268-002 for the December 10, 2019 to December 10, 2020 policy period (the "Policy").

3.      As a result, VSP brings the instant action for (1)  breach of contract, (2) breach of the implied covenant of good faith and fair dealing (bad faith), (3)  declaratory relief, and (4) specific performance.

# PARTIES

4.      At all relevant times, Plaintiff was a not-for profit corporation formed in 1955 and organized under the laws of California, with its principal place of business in Rancho Cordova in Sacramento County, California.

5.      At all relevant times, Plaintiff was informed and believes that Defendant is a stock insurance company incorporated in Illinois that is authorized to do business, and doing business in the State of California as a licensed and regulated insurance company under the laws of this State.

6.      At all relevant times mentioned herein, the true names and capacities, whether

BUCHALTER
A PROFESSIONAL CORPORATION
NAPA

BN 69085392V4

**COMPLAINT FOR DAMAGES AND OTHER RELIEF**

individual, corporate, associate or otherwise, of Defendants and DOES 1 through 50, inclusive, are currently unknown to Plaintiff, who therefore brings suit against these Defendants by their fictitious names and capacities. Plaintiff is informed and believes and thereupon alleges that each fictitiously named Defendant, whether acting for itself or as an agent, corporation, association, or otherwise, is liable or responsible to Plaintiff and proximately caused injuries and damages to Plaintiff as alleged herein. While at this time Plaintiff is unaware of the true names and capacities of the DOE Defendants, Plaintiff will amend this Complaint to show the true names and capacities of DOES 1 through 50, inclusive, when those identities have been ascertained.

7.      Chubb and DOES 1-50 are referred to collectively as the "Defendants" herein.

8.      At all relevant times mentioned herein, each of the Defendants so named or identified by fictitious names were the agents, employees, supervisors, servants and joint venturers of each other, and in doing the things hereafter alleged, were acting within the course, scope and authority of such agency, employment and joint venture and with the consent and permission of each of the other Defendants. All actions of each Defendant alleged in the causes of action into which this paragraph is incorporated by reference were ratified and approved by the principals, partners, hiring contractors, officers or managing agents of every other Defendant.

**JURISDICTION AND VENUE**

9.      Jurisdiction of this action is proper pursuant to California Code of Civil Procedure §§ 410.10, 410.50 and 1060, among others.

10.     The Premises Pollution Liability Insurance Policy provides at the "Service of Suit Endorsement": "If the insured requests, [Chubb] will submit to the jurisdiction of any court of competent jurisdiction."

11.     Venue of this action is proper in this judicial district pursuant to California Code of Civil Procedure § 395, among others, as the Plaintiff's principal place of business is in the judicial district in which this action is filed, the policy was negotiated and entered into in this judicial district, and the subject matter of the insurance dispute concerns business interruption losses and first party remediation costs incurred, in part, in the county and within this judicial district.

**COMPLAINT FOR DAMAGES AND OTHER RELIEF**

BUCHALTER
A PROFESSIONAL CORPORATION
NAPA

BN 69085392V4

## FACTUAL BACKGROUND

12.     This is an insurance coverage dispute arising from Chubb's failure to promptly adjust and remit reimbursement for "Loss," including business interruption loss and remediation costs incurred by the Plaintiff during and in the aftermath of the global COVID-19 pandemic as its retail locations and corporate offices were shuttered pursuant to various Civil Orders as well as due to the presence of the COVID-19 virus at VSP's business locations.  Upon the lifting (or in some instances partial lifting) of these orders, Plaintiff incurred significant costs to remediate its business locations, including deep cleaning and other protocols designed to neutralize and remove the presence of the COVID-19 virus, which virus was confirmed, regrettably, as present at Plaintiff's business locations due to confirmed cases and in several instances deaths, among Plaintiff's employees and customers.  To date Chubb has denied any coverage for this Claim, even though the Policy broadly defines "Pollution Condition" to include "any" "irritant" or "contaminant" as well as "infectious … wastes" and the Policy contains no exclusion for losses caused by a virus.  As a result of Chubb's breaches of its contractual, legal, statutory, and implied obligations owed to VSP, VSP's unreimbursed expenses incurred to remediate its locations and comply with safe re-opening protocols exceed $20 million.  VSP's unreimbursed business interruption losses incurred as a result of the suspension of its business operations and extra expenses incurred in response to same are in the hundreds of millions of dollars.  The following factual allegations are common to each and every Cause of Action stated in this Complaint, and hereafter shall be incorporated in each such claim alleged:

**A.  The Coronavirus Pandemic**

13.     In late 2019 and early 2020, COVID-19 began spreading across the world and, to date, over 446 million people have become infected and seriously ill.  Tragically, to date over 6 million people have died from COVID-19. Since the onset of the COVID-19 pandemic, numerous studies have been conducted on the methods of transmission of the coronavirus.  The World Health Organization ("WHO") has confirmed that the coronavirus can and does exist on objects or surfaces.  According to the WHO "[t]ransmission of SARS-CoV-2 can occur through direct,

BUCHALTER
A PROFESSIONAL CORPORATION
NAPA
BN 69085392V4

**COMPLAINT FOR DAMAGES AND OTHER RELIEF**

indirect, or close contact with infected people through infected secretions such as saliva and respiratory secretions or their respiratory droplets, which are expelled when an infected person coughs, sneezes, talks or sings." Transmission can also occur when a surface area becomes infected with the droplets. According to the WHO, "transmission may also occur indirectly through touching surfaces in the immediate environment or objects contaminated with virus from an infected person (e.g. stethoscope or thermometer), followed by touching the mouth, nose, or eyes."[1]

14. Scientific studies have confirmed the coronavirus may remain in the air and on surfaces for time periods ranging from minutes to hours to days. An academic molecular epidemiologist, Dr. Marc Goodman has concluded that SARS-COV-2, the virus that causes the disease COVID-19, has a physical presence and it can exist in the air and on surfaces for indeterminate periods of time, which can then transfer it into the human bodies.

15. Numerous researchers have studied how long SARS-CoV-2 can survive on a variety of porous and non-porous surfaces. On porous surfaces, studies report an inability to detect viable virus within minutes to hours; but on non-porous surfaces, such as glass, plastics, metals, and wood, viable virus can be detected for days to weeks.[2] Several studies have found the SARS-CoV-2 virus can remain on surfaces for up to 28 days.[3]

16. To substantially inactivate and neutralize SARS-CoV-2 on surfaces, the surface must be treated with disinfectant products registered with the United States Environmental Protection Agency's (EPA's) List for technology that has been shown to be effective against the virus. [4]

---

[1] https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (visited on March 7, 2022).

[2] Alex W H Chin, Julie T. S. Chu, Mahen R. A. Perera. "Stability of SARS-CoV-2 in different environmental conditions." *Lancet Microbe*, vol. 1, p. e10 (2020).

[3] CNBC, *Virus that causes COVID-19 can survive for 28 days on common surfaces, research says* (Oct. 12, 2020), https://www.cnbc.com/2020/10/12/virus-that-causes-covid-19-can-survive-for-28-days-on-surfaces-research-says.html (last visited on March 7, 2022); Public Health Responses to COVID-19 Outbreaks on Cruise Ships — Worldwide, February–March 2020, Centers for Disease Control and Prevention (Mar. 27, 2020) https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm (last visited on March 7, 2022) (noting detection of virus on surfaces 17 days after guest had vacated the cabin).

[4] A. Chang, A. H. Schnall, R. Law, A. C. Bronstein, J. M. Marraffa, H. A. Spiller, H. L. Hays, A. R. Fun, M.

BUCHALTER
A PROFESSIONAL CORPORATION
NAPA

BN 69085392V4

17.     These studies demonstrate that the SARS-CoV-2 virus attaches to physical surfaces and alters the physical condition of air in buildings, thereby causing physical change to property. These studies also demonstrate that the COVID-19 disease is transmitted through air and on surfaces and causes contamination to the air and surfaces upon contact.

18.     In response to the transmission of COVID-19 across the world and in the United States, national, state and local authorities mandated closures of public facilities, retail locations, businesses and schools, which resulted in the suspension and partial suspension of business across all lines of VSP's business operations.

19.     On March 4, 2020, California Governor Gavin Newsom declared a state of emergency as a result of the threat of COVID-19.

20.     On March 11, 2020, the WHO classified COVID-19 as a pandemic.

21.     On March 13, 2020, President Trump declared a national emergency with respect to the COVID-19 outbreak.

22.     On March 19, 2020, California Governor Gavin Newsom issued Executed Order N33-20, which mandated the closure of all retail locations and businesses in California other than those considered "essential."

23.     Between March 2020 and sometime around November 2020, there have been a number of civil orders, on both the local and national level, mandating businesses to either fully or partially suspend business operations, which have further disrupted and significantly impacted VSP's business operations.

24.     The COVID-19 pandemic is ongoing to this day.  Most recently, variants of the SARS-CoV2 virus have spread across the world, including the Delta variant in late 2020 and the Omicron variant in late 2021.  These surges have caused additional lockdowns and costs as businesses seek to keep their customers safe.

---

Mercurio-Zappala, D. P. Calello, A. Aleguas, D. J. Borys, T. Boehmer and E. Svendsen, "Cleaning and Disinfectant Chemical Exposures and Temporal Associations with COVID-19 — National Poison Data System, United States, January 1, 2020–March 31, 2020," Morbidity and Mortality Weekly Report (MMWR), vol. 69, no. 16, pp. 496-498, (2020).

**COMPLAINT FOR DAMAGES AND OTHER RELIEF**

BUCHALTER
A PROFESSIONAL CORPORATION
NAPA
BN 69085392V4

B. __The Impact of the Coronavirus Pandemic on VSP__

25.    VSP is a parent corporation for multiple entities across the world with distinct lines of business. VSP Global includes five distinct lines of business, each of which was negatively impacted by the COVID-19 pandemic.  These lines of business include: (1) **Vision Care**, the largest national not-for-profit vision benefits and services company for eye care and eyewear services; (2) **VSP Retail,** which includes Visionworks (over 720 retail locations including over 500 in-store labs), VSP Ventures (retail locations co-owned with physicians), Eyeconic (on-line presence), and over 28 on-site clinics where VSP provides direct retail services on or near large corporate campuses; (3) **Eyewear**, which includes Marchon an eyewear manufacturer and operator of several retail locations; (4) **VSP Optics**, provider of ophthalmic technology, lens products and lab services including through over 15 wholly owned labs, and (5) **Practice Solutions,** which includes Eyefinity, the largest practice management software and e-commerce portal for the optical industry.

26.    Of VSP's five lines of business, initially only one line, VSP's Vision Care division, was considered "essential" under the civil orders mandating closure of retail business.  Vision Care was able to remain open, but customer traffic and sales plummeted.

27.    VSP's in-person retail operations at its over 720 Visionworks stores across the country ceased entirely between March 22, 2020 and approximately June of 2020 when phased re-opening were permitted in certain states.

28.    Operations at VSP's on-site clinics, VSP Ventures and VSP laboratories (both contract and wholly owned) were also significantly limited.  Access to VSP's on-site clinics was prohibited as the corporate campuses were ordered closed.

29.    Both the Vision Care and Practice Solutions lines of business experienced significant declines in benefits utilization as customers were unable to be seen by eye care doctors and purchase eyewear.  Benefit utilizations also dropped as customers lost jobs and with this lost employment lost the benefits to obtain eyecare.

30.    The Eyewear line of business experienced, and continues to experience, interruption in its supply chain due to closures of manufacturing operations in China, Italy and New York as

**COMPLAINT FOR DAMAGES AND OTHER RELIEF**

BUCHALTER
A Professional Corporation
Napa

BN 69085392V4

well as declines in frame sales at its shuttered Marchon retails stores.

31.    For VSP Optics, in addition to significant decreases in demand for lens products, civil orders and positive test results of employees closed multiple labs thereby resulting in increased financial losses.

32.    To date, Plaintiff's employees have had over 3,500 positive tests and diagnoses of COVID-19, confirming the presence of the virus on the premises (both surfaces and air) of VSP's locations including corporate offices, laboratories, and multiple retail locations. Tragically, eleven employees died as a result of a COVID-19 infection. Several of the documented COVID-19 cases among VSP employees occurred in early March of 2020. These documented infections of employees present at the premises confirm the release, dispersal and presence of the COVID-19 virus in the air and on the surfaces of VSP's locations and the resulting physical alteration and contamination of those surfaces and the air due to the nature of the virus as a contaminant, irritant and infectious waste, which alteration and contamination required deep cleaning and other mechanisms to neutralize, immobilize, mitigate and remove the contaminant.

33.    Moreover, customer foot traffic at VSP's over 700 retail locations in the days leading up to the sudden closure of these locations was approximately 90,000 visits per week. The demographics of VSP's retail customers generally lean toward an older population with 40.9% of Visionworks customers in the 45 to 60+ age bracket. In March of 2020, this demographic group was considered high risk with a documented higher rate of infection than the general population. This steady foot traffic combined with the customer demographic render it a statistical certainty that at least one, but likely many more, customers visiting the stores in mid-March of 2020 were infected and transmitting and releasing the virus in the air and on the surfaces of the stores. The likelihood of the presence of the SARS-Cov-2 virus in the air and on the surfaces from these likely infections confirms the resulting physical alteration and contamination of those surfaces and the air due to the virus.

34.    Beginning in June of 2020, VSP began a phased re-opening of certain locations consistent with local re-opening orders and subject to significant protocols and reduced capacity.

**COMPLAINT FOR DAMAGES AND OTHER RELIEF**

BUCHALTER
A Professional Corporation
Napa

BN 69085392V4

VSP determined it would be in the business' best interest to re-open safely to serve its customers and to mitigate its significant financial losses.

35.     In an effort to remediate the contamination and physical alteration to property at its locations from the presence of COVID-19 at its business locations, including efforts to neutralize, remove and immobilize the virus in the air and on surfaces, VSP instituted extensive new protocols and precautions to safely re-open its laboratories and retail locations and decrease the infections, releases and transmission from the infectious wastes.

36.     The re-openings however came at significant additional cost in terms of, and by way of example only, regular deep cleaning and increased sanitation protocols, mandatory weekly employee COVID-19 testing, onsite testing laboratory contract expenses, monitoring/health checks of customers and employees, personal protection equipment for customers and employees, social distancing markers and barriers, limited hours and significantly reduced capacity to allow for social distancing to immobilize and neutralize the contaminants and infectious wastes.  Even as soon as mid-May of 2020, VSP had incurred nearly $150,000 in deep cleaning costs associated with the few stores that were permitted to partially open as of that timeframe.

37.     These protocols, however, severely limited VSP's volume of business.  Customers at VSP's on-site clinics and Visionworks locations experienced significant waiting list delays as capacity in stores and clinics was severely reduced due to social distancing protocols, reduced hours, capacity controls, and additional cleaning protocols between each customer.  As a result, customer traffic today versus pre-COVID customer traffic has dramatically decreased resulting in lost business income and extra expense.

38.     The EPA has issued guidance regarding the removal and remediation of COVID-19 after an outbreak.[5]  The EPA has also issued recommendations regarding precautions to reduce the potential for airborne transmission and releases of the virus.[6]  Further, with respect to indoor air

---

[5] EPA's joint guidance with the CDC regarding cleaning and disinfecting public spaces, workplaces, businesses, schools, and homes; https://www.cdc.gov/coronavirus/2019-ncov/community/disinfecting-building-facility.html.

[6] https://www.epa.gov/coronavirus/air-cleaners-hvac-filters-and-coronavirus-covid-19

**COMPLAINT FOR DAMAGES AND OTHER RELIEF**

BUCHALTER
A PROFESSIONAL CORPORATION
NAPA

BN 69085392V4

1    quality, the EPA defines "biological contaminants" to include bacteria and viruses.[7]

2        39.    In compliance with these EPA protocols, VSP has incurred significant expense to

3    institute enhanced daily cleaning of retail locations, including cleaning protocols for surfaces

4    between each customer to remove the virus and treatment to prevent future exposure to this

5    contaminant and infectious waste.  These protocols have continued to date as variants, such as the

6    Delta and Omicron, have required those responsible for public spaces to remain ever vigilant in

7    terms of deep cleaning and disinfection protocols to prevent further releases.

8        40.    Upon the gradual re-opening of operations, several Visionworks locations and

9    multiple VSP Optics laboratories (including VSP One New York, VSPOne San Diego and VSPOne

10   Dallas) reported positive results and suspected COVID-19 infections for employees and customers.

11   In response to these exposures, VSP temporarily closed these locations and performed, at

12   significant expense, industrial deep cleanings, disinfection measures, and decontamination at these

13   locations to remove, neutralize and immobilize the contaminant and infectious waste.

14       41.    In addition to incurring the extensive costs of remediating its locations to comply

15   with safety protocols for its customers and employees, VSP's business, laboratory and

16   manufacturing operations have been negatively impacted.  These negative impacts include, but are

17   not limited to, decreased sales and production, decreased benefit utilization by customers, necessary

18   lay-offs and furloughs, decreased manufacturing, increased production costs, extra expense to move

19   operations on-line and virtual, and extra expenses incurred to comply with re-opening protocols

20   (such as testing costs, PPE for workers, retro-fitting of stores, laboratories and offices to comply

21   with social distancing, additional cleaning, protective dividers and plexi-glass shields, and signage

22   for social distancing).

23       42.    To date VSP has incurred in excess of $20 million in remediation costs, including

24   to decontaminate, dispose of the infectious waste, disinfect its locations and to remove, neutralize

25   and immobilize the release, transmission and presence of the virus through the air and on the

26   surfaces at these locations and to comply with safe re-opening protocols including PPE, retro-fitting

27

28   ---
     [7] https://www.epa.gov/indoor-air-quality-iaq/biological-pollutants-impact-indoor-air-quality#Standards

**COMPLAINT FOR DAMAGES AND OTHER RELIEF**

BUCHALTER
A PROFESSIONAL CORPORATION
NAPA

BN 69085392V4

and testing.  VSP continues to incur costs to monitor and to ensure that its business operations at its retail locations, corporate offices and laboratories are continuously in compliance with the latest recommendations by local and federal agencies pertaining to the transmission of COVID-19 to prevent further infections and contamination.

43.     VSP has also incurred extensive business interruption losses in the form of lost business income and extra expense as a result of the presence of the virus at its locations and the civil orders mandating closure of its in-person operations to stop the spread of the COVID-19, including significantly reduced retail and laboratory sales, decreased purchase of policies, and decreased benefit utilization in the form of reduced doctor examinations and decreased retail sale of lenses and frames.  VSP has also incurred additional personnel costs due to furloughs and lay-offs caused by the lockdowns and decrease in business.  These losses are in the hundreds of millions.

**C.     The Chubb Premises Pollution Liability Insurance Policy**

44.     In consideration of substantial premiums paid, Chubb issued a Premises Pollution Liability Insurance Policy identified as Policy No. PPL G71469268-002 (the "Policy") to first named insured "Vision Service Plan (VSP)" for the December 10, 2019 to December 10, 2020 policy period.  A true and correct copy of the Policy, is attached as Exhibit "A" hereto and incorporated by reference.

45.     Throughout the entire tenure of the Policy, Plaintiff duly paid all premiums charged by Chubb and has otherwise performed under the Policy as required, except for performing such terms, conditions and covenants excused by Chubb's breach and/or non-performance.

46.     The Policy includes by way of Endorsements numbered 1, 2 and 3, additional named insureds including, but not limited, to various corporate subsidiaries, Eyeconic, Inc., Eyefinity, Inc., Marchon Eyewear, Inc., Altair Eyewear, Inc., VSP Global, Inc., VSP Labs, Inc., VSP Vision Care, Inc., VSP Retail, Inc., VSP Ventures Management Services, LLC, Visionworks of America, Inc., and VSP Optical Group, Inc.

47.     The Declarations of the Policy provide a "Per Pollution Condition or Indoor

BUCHALTER
A PROFESSIONAL CORPORATION
NAPA

BN 69085392V4

**COMPLAINT FOR DAMAGES AND OTHER RELIEF**

Environmental Condition Limit of Liability" of $3,000,000 and a "Total Policy and Program Aggregate Limit of Liability for All Pollution Conditions and Indoor Environmental Conditions" of $5,000,000.

48.     The Declarations of the Policy further provide a "Self- Insured Retention/Deductible Period" of $50,000 "Per Pollution Condition or Indoor Environmental Condition" and 3 "Days Per Pollution Condition or Indoor Environmental Condition."

49.     Insuring Agreement A of the Policy is entitled "POLLUTION CONDITIONS OR INDOOR ENVIRONMENTAL CONDITIONS COVERAGE (Coverage **A**.)."

50.     Under Insuring Agreement A of the Policy, Chubb promised in relevant part to "pay on behalf of the 'insured' for 'loss', in excess of the 'self-insured retention' or deductible period (as applicable) resulting from:

> "Claims" and "first-party claims" arising out of: 1) a "pollution condition" on, at, under or migrating from a "covered location" … provided the claim is first made, or the "insured" first discovers the "pollution condition" … that is the subject of such "first party claim," during the "policy period." Any such "claim" or "first-party claim" must be reported to the Insurer, in writing, during the "policy period" or within thirty (30) days after the expiration of the "policy period."
>
> The coverage afforded pursuant to this Coverage A. only applies to "pollution conditions" … that first commence, in their entirety, on or after the retroactive date identified in Item 5. of the Declarations [9/14], if applicable, and prior to the expiration of the "policy period."

51.     Under the Policy, the term "First-party claim" is defined in relevant part as "the first-party discovery of a 'pollution condition' … during the 'policy period' by an 'insured' to which this insurance applies."

52.     The Policy broadly defines, in relevant part, a "Pollution Condition" as:

> The discharge, dispersal, release, escape, migration, or seepage of *__any__* solid, liquid, gaseous, or thermal *__irritant, contaminant, or pollutant__*, including soil, silt, sedimentation, smoke, soot, vapors, fumes, acids, alkalis, chemical, electromagnetic fields (EMFs), hazardous substances, hazardous materials, waste materials, "low-level radioactive waste", "mixed waste" and medical, red bag, *__infectious or pathological wastes__* on, in, into or upon land and structures thereupon, the atmosphere, surface water, or groundwater.
>
> Policy at Section V., Definitions, Para. LL (emphasis added).

BUCHALTER
A PROFESSIONAL CORPORATION
NAPA

BN 69085392V4

53.     With respect to "pollution conditions" at a "covered location," "Loss" under the Policy is defined to include, in relevant part, "First-party remediation costs" and "Business interruption loss."

54.     The Policy defines "First-party remediation costs" to include:

Reasonable and necessary "remediation costs" incurred by an "insured" resulting from a "first party claim." If no applicable laws exist that govern the remediation, investigation, quantification, monitoring, removal, disposal, treatment, neutralization, or immobilization of such "pollution condition" … in the jurisdiction of the "covered location," necessary "remediation costs" may be established by securing the written professional recommendation of an "environmental professional."

"First party remediation costs" also means reasonable and necessary expenses required to restore, repair or replace real or personal property to substantially the same condition it was in prior to being damaged during the course of responding to a "pollution condition" …

55.     The Policy defines "remediation costs" to include, in relevant part: "expenses incurred to investigate, quantify, monitor, remove, dispose, treat, neutralize, or immobilize 'pollution conditions' … to the extent required by 'environmental law' in the jurisdiction of such 'pollution condition' …"

56.     The Policy defines "Environmental Law" to include in relevant part:

"Environmental law" means any Federal, state, commonwealth, municipal or other local law, statute, ordinance, rule, guidance document, regulation, and all amendments thereto (collectively Laws), including voluntary cleanup or risk-based corrective action guidance, or the direction of an "environmental professional" acting pursuant to the authority provided by any such Laws, along with any governmental, judicial or administrative order or directive, governing the liability or responsibilities of the "insured" with respect to a "pollution condition" or "indoor environmental condition".

57.     "Business interruption Loss" is defined, in turn, to include: "l. 'Business income'; 2. 'Extra expense'; and 3. 'Delay expense.'"

58.     "Business interruption" is defined under the Policy in relevant part to include: "the necessary partial or complete suspension of the 'insured's' operations at a 'covered location' for a period of time, which is directly attributable to a 'pollution condition' … to which Coverage **A.** of this Policy applies. Such period of time shall extend from the date that the operation are necessarily suspended and end when such 'pollution condition' … has been remediated to the point at which

**COMPLAINT FOR DAMAGES AND OTHER RELIEF**

BUCHALTER
A PROFESSIONAL CORPORATION
NAPA

BN 69085392V4

1    the 'insured's' normal operations could be reasonable restored."

2           59.    "Business income" is defined under the Policy in relevant part to include: "Net profit

3    or loss, before income taxes, … [and] the 'insured's' continuing operating and payroll expense."

4           60.    Under the Policy, a "'covered location" includes, in relevant part, "[a]ny location

5    that is specifically identified on a Schedule of Covered Locations attached to this Policy."

6    Endorsement No. 13 to the Policy is entitled "Schedule of Covered Locations Endorsement" and

7    lists multiple locations across the country as "additional covered locations."

8           61.    There is no exclusion under the Policy for "Loss" caused by, or arising out of, or

9    related to viruses such as coronavirus or COVID-19, which, under the Policy, constitute a pollution

10   condition.

11          62.    Indeed, none of the enumerated exclusions within the Policy expressly exclude

12   coverage for loss sustained as a direct result of a virus, bacteria, communicable disease, pandemic,

13   or other contagion.

14          63.    The Policy does contain exclusions for other substances that might be within the

15   definition of "Pollution Condition," including exclusions for asbestos and lead-based paint.

16          64.    Pursuant to the Policy, VSP purchased a "Premises Pollution Liability Insurance

17   Policy" with limits of $3 million per "Pollution Condition" and broadly defined such "Pollution

18   Condition" to include "any" "irritant" or "contaminant" including "infectious or pathological

19   waste."  VSP reasonably understood that the air and surface contamination of its locations resulting

20   from releases of the virus constituted a "pollution condition" within the meaning of the Policy.

21   VSP reasonably expected that the significant costs it incurred to remove, neutralize and immobilize

22   that contaminant and to remediate and treat the air and surfaces in its locations would constitute

23   "first-party remediation costs" within the scope of the Policy's definition of "Loss."  VSP further

24   reasonably understood that the significant business interruption loss it suffered as a result of the

25   civil orders suspending its operations would be within the Policy's definition of "Loss."

26   **D.     VSP's Request for Coverage**

27          65.    On or about April 7, 2020, VSPtimely submitted a claim to Chubb under the Policy

28

---

14

**COMPLAINT FOR DAMAGES AND OTHER RELIEF**

for "Loss" arising from "Pollution Conditions" resulting from the COVID-19 pandemic, including the mandated closure of all of its retail locations and suspension of operations (including at its laboratories). The claim was assigned Claim Number PPL G71469268 002 (the Claim).

66.     Chubb did not respond to VSP's April 7, 2020 tender until June 1, 2020. That letter referenced the "Purported losses due to COVID-19" and advised that "coverage is not available" for the Claim. That denial was predicated on Chubb's summary conclusion that COVID-19 and the contamination it caused in the air and on the premises of VSP's locations could not constitute a "Pollution Condition" under the Policy even though the Policy contained no exclusion for virus. Chubb claimed in its June 1, 2020 denial that "[a]t this time, we have not been provided with further information regarding this Claim," even though Chubb had, as of that date, not requested additional information or been in contact with VSP to discuss the particulars of the claim. Curiously, VSP received a second letter dated June 2, 2020 from Chubb also denying coverage.

67.     In response to that denial, and the extensive and ongoing losses VSP was continuing to incur, VSP retained coverage counsel to assist VSP with establishing its right to coverage under the Policy. Coverage counsel to VSP sought reconsideration of Chubb's denial of coverage by correspondence dated July 17, 2020. VSP disputed Chubb's denial, *inter alia*, with reference to the Policy's broad definition of "Pollution Condition" and the absence of any virus exclusion. VSP also sought clarification regarding its receipt of two denial letters dated June 1, 2020 and June 2, 2020. VSP also questioned the sufficiency of Chubb's claims handling and *Chubb's* obligation to diligently investigate coverage consistent with California's Fair Settlement Practices Regulations in consideration of Chubb's delay in responding to the tender and Chubb's accusation that VSP had not provided additional information—which had not been requested. In light of its mounting losses, VSP requested a response by July 31, 2020.

68.     By correspondence dated August 11, 2020, coverage counsel retained by Chubb reaffirmed its denial of coverage. Chubb's second denial of coverage primarily relied upon its interpretation of the Policy as being limited to "traditional environmental pollution," although that phrase appears nowhere in the Policy. Chubb also claimed that VSP had provided no information

**COMPLAINT FOR DAMAGES AND OTHER RELIEF**

BUCHALTER
A PROFESSIONAL CORPORATION
NAPA

BN 69085392V4

1   showing that coronavirus was found at a "covered location," although Chubb had not previously

2   requested such information.  Chubb disputed any failure on its part to properly investigate coverage

3   and invited *VSP* "to provide any additional information it believes may have a bearing upon

4   *Chubb's* analysis of coverage for this matter."  (emphasis added).

5           69.     VSP responded to Chubb's second denial by correspondence dated October 27,

6   2020.  In that correspondence, VSP continued to dispute Chubb's truncated interpretation of the

7   Policy's coverage for "Pollution Conditions" and provided additional information regarding the

8   existence of SARS-Cov-2 at VSP's "covered locations," including how 142 employees as of that

9   date had been diagnosed with coronavirus and tragically two employees had died as a result.  VSP

10  also provided information regarding customer foot traffic at its over 700 retail locations in the days

11  leading up to the sudden closure of all stores.  VSP also noted that Chubb's vague invitation for

12  VSP to provide "additional information it believes may have a bearing upon Chubb's analysis of

13  coverage" without identifying information that Chubb considers pertinent to its coverage evaluation

14  is not consistent with a fulsome investigation of coverage by the insurer as required by law.  VSP

15  again advised that its financial losses were devastating and such losses were being exacerbated by

16  the absence of any recovery under the Policy.

17          70.     By correspondence dated December 7, 2020, Chubb again reaffirmed its denial of

18  coverage.  In its third denial of coverage, Chubb maintained its rewriting of the Policy as limited

19  to "traditional environmental pollution" and, to support that revision, cited to a case applying

20  Arizona law.

21          71.     As of the date of the filing of this action, VSP's out-of-pocket costs incurred by VSP

22  to "remove," "neutralize" and "immobilize" the "pollution condition" created by the virus that

23  causes COVID-19 at VSP's "covered locations" and to comply with re-opening protocols exceed

24  $20 million.  VSP's business interruption losses attributable to the COVID-19 pandemic (including

25  the total suspension and partial suspension of operations in response to civil orders and extra

26  expenses) are in the hundreds of millions.  VSP continues to incur monitoring costs as well as

27  interest on the amounts incurred, which amounts were incurred beginning in March of 2020.

28

**COMPLAINT FOR DAMAGES AND OTHER RELIEF**

BUCHALTER
A PROFESSIONAL CORPORATION
NAPA

BN 69085392V4

72.     Chubb's "Pollution Condition" coverage under the Policy is presently due, owing and payable in reasonable amounts toward VSP's "first party remediation costs" and "business interruption losses," but Chubb has wrongfully failed to provide such coverage in breach of its obligations arising under the Policy—whether those obligations are written, oral, statutory, expressed or implied in law—all of which remain due and owing to VSP by Chubb, but have not been performed in a manner as required by law and as further alleged herein.

73.     Chubb's failure to provide benefits owing, and to serially deny coverage based on unreasonable policy interpretations and a delayed and deficient claims investigation are contrary to Chubb's obligations of good faith and fair dealing owed under the Policy and at law.

## FIRST CAUSE OF ACTION

## (BREACH OF INSURANCE CONTRACT)

74.     Plaintiff realleges and incorporates as though set forth at length and in full all facts and allegations stated in Paragraphs 1 through 73, inclusive, above.

75.     In consideration of significant premiums paid, Chubb issued a "Premises Pollution Liability Insurance Policy" to VSP bearing Policy number PPL G71469268 002. (*See* Exhibit A).

76.     The Declarations of the Policy provide a "Per Pollution Condition or Indoor Environmental Condition Limit of Liability" of $3,000,000 and a "Total Policy and Program Aggregate Limit of Liability for All Pollution Conditions and Indoor Environmental Conditions" of $5,000,000.

77.     Under Insuring Agreement A of the Policy, Defendants are obligated to "pay on behalf of the 'insured' for 'loss', in excess of the 'self-insured retention' or deductible period (as applicable) resulting from:

> "Claims" and "first-party claims" arising out of: 1) a "pollution condition" on, at, under or migrating from a "covered location" … provided the claim is first made, or the "insured" first discovers the "pollution condition" … that is the subject of such "first party claim," during the "policy period."

78.     The Policy broadly defines, in relevant part, a "Pollution Condition" as:

> The discharge, dispersal, release, escape, migration, or seepage of ***any*** solid, liquid, gaseous, or thermal ***irritant, contaminant, or pollutant***, including soil, silt, sedimentation, smoke, soot, vapors, fumes, acids, alkalis, chemical, electromagnetic

fields (EMFs), hazardous substances, hazardous materials, waste materials, "low-level radioactive waste", "mixed waste" and medical, red bag, *infectious or pathological wastes* on, in, into or upon land and structures thereupon, the atmosphere, surface water, or groundwater.

Policy at Section V., Definitions, Para. LL (emphasis added).

79.    With respect to "pollution conditions" at a "covered location," "Loss" under the Policy is defined to include, in relevant part, "First-party remediation costs" and "Business interruption loss."

80.    There is no exclusion under the Policy for "Loss" caused by, or arising out of, or related to viruses such as coronavirus or COVID-19.

81.    The Policy insured and covered the losses incurred by VSP, in the form of "first-party remediation costs" and "business interruption loss" arising from a "pollution condition" resulting from the release and presence of the SARS-Cov-2 virus in the air and on the surfaces of Plaintiff's business locations, causing physical alteration, contamination and damage, and the ongoing COVID-19 pandemic.

82.    The Plaintiff has paid all required premiums under the Policy, has timely tendered its claim for covered "Loss" under the Policy to Chubb during the Policy Period, and has otherwise performed all conditions, covenants and promises under the Policy as required, except for performing such terms, conditions and covenants excused by Chubb's breach and/or non-performance.

83.    Defendants breached the Policy, a written contract, by, *inter alia*, failing and refusing to pay the full value of the Claim tendered to it for the covered losses encompassed therein.

84.    As a direct and foreseeable consequence and result of Defendants' breaches of the insurance contract, Plaintiff has sustained covered "loss" arising from a "pollution condition" and other financial damages that are due and owing by Defendants, in an amount in excess of the jurisdictional minimum, according to proof at trial.

85.    The amounts claimed by Plaintiff that are due, owing and currently remain unpaid by Defendants under the Policy, were reasonably foreseeable and such amounts can be calculated with reasonable certainty at the time such covered losses were sustained and incurred by Plaintiff,

BUCHALTER
A PROFESSIONAL CORPORATION
NAPA
BN 69085392V4

**COMPLAINT FOR DAMAGES AND OTHER RELIEF**

1  entitling it to the addition of prejudgment interest on the amount of any such losses due under

2  contract to the full extent allowable by the law of this State.

3  **SECOND CAUSE OF ACTION**

4  **(BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)**

5      86.    Plaintiff realleges and incorporates as though set forth at length and in full all facts

6  and allegations stated in Paragraphs 1 through 85, inclusive, above.

7      87.    In consideration of substantial premiums paid by VSP, Chubb issued the referenced

8  Policy. (*See* Exhibit A).

9      88.    Under Insuring Agreement A of the Policy, Defendants are obligated to "pay on

10 behalf of the 'insured' for 'loss', in excess of the 'self-insured retention' or deductible period

11 (as applicable) resulting from:

12     "Claims" and "first-party claims" arising out of: 1) a "pollution condition" on, at,
   under or migrating from a "covered location" … provided the claim is first made,

13     or the "insured" first discovers the "pollution condition" … that is the subject of
   such "first party claim," during the "policy period."

14     89.    The Policy, like every insurance policy providing coverage for legally insurable

15 interests in this State, includes an implied covenant of good faith and fair dealing.  The

16 covenant requires that the insurance company and its designated representatives who are

17 authorized to act on its behalf will not do anything to injure or deprive the rights of VSP,

18 as the insured, to receive the full and timely benefits of all coverage due for losses payable under

19 the contract of insurance.

20     90.    Defendants have engaged in unreasonable conduct and breached their duties of good

21 faith and fair dealing owed to VSP under the Policy by, *inter alia*:

22     a.    Unreasonably and without proper cause refusing to timely pay the full amount

23         of benefits due and owing for covered losses under the Policy, despite repeated

24         demands, at a time when Defendants knew VSP was entitled to such sums under

25         the terms of the Policy and California insurance jurisprudence;

26     b.   Failing to acknowledge and act reasonably promptly upon communications

27         with respect to VSP's claims arising under the Policy including as required by

28

BUCHALTER
A Professional Corporation
Napa

BN 69085392V4

**COMPLAINT FOR DAMAGES AND OTHER RELIEF**

California Insurance Code section 790.03, subdivision (h), Insurance Code sections 2070 and 2071 and 10 California Code of Regulations sections 2695.7 (b)(hereafter California's Fair Claims Settlement Practices);

c. Failing to communicate clearly and accurately with VSP;

d. Failing to diligently and timely conduct a reasonable, fair and objective claim investigation and thereby violating California's Fair Claims Settlement Practices including California Code of Regulations at Section 2695.7(d) requiring that "[e]very insurer shall conduct and diligently pursue a thorough, fair and objective investigation;"

e. Failing to consider VSP's interests at least as much as the insurer's own interests in the handling, adjustment, payment and settlement of claims for benefits due and owing under the Policy, and instead placing the Defendants' interests ahead of the interests of the VSP;

f. Improperly and unreasonably delaying the investigation and payment of covered claims or benefits by offering pre-textual and unsupported excuses for the nonpayment of covered loss under the Policy including a retroactive and revisionist interpretation of the Policy as being limited to "traditional environmental pollution" although that phrase appears nowhere in the Policy and instead "pollution condition" is defined to include "any" "contaminant" or "irritant" including "infectious or pathological wastes;"

g. Applying unreasonable interpretations of the Policy to avoid providing coverage under the Policy as required, including but not limited to: (1) narrowly interpreting the Policy's "pollution condition" definition which is broadly defined to include "any" "contaminant," or "irritant," (2) ignoring and conflating the terms "irritant" and "contaminant" with "pollutant," (3) ignoring the phrase "pathological and infectious wastes" in the definition of "pollution condition," and (4) unreasonably disregarding the Policy's absence of any virus

BUCHALTER
A PROFESSIONAL CORPORATION
NAPA

BN 69085392V4

1        exclusion;

2        h.   Attempting to foist its obligation in the first instance to thoroughly investigate coverage by directing VSP to "to provide any additional information it believes may have a bearing upon *Chubb's* analysis of coverage for this matter," without specifying what information Chubb would consider pertinent, and as such violating Section 2695.7 (d) of California's Fair Claims Settlement Practices;

7        i.   On information and belief, failing to adopt and implement reasonable standards for the prompt investigation and processing of the Claim;

9        j.   Failing to reasonably and diligently search for evidence and other information that would support VSP's claim for covered benefits due and owing under the Policy, and instead searching only for ways to delay or deny the Claim; and

12        k.   Failing to promptly pay claims where liability for covered losses under the Policy is reasonably clear and forcing VSP, to retain counsel and commence a lawsuit to obtain prompt and full payment due and owing under the Policy.

91.    In declining and delaying to fulfill their coverage obligations owed to VSP under the Policy, Defendants acted unreasonably and with the knowledge that there was no reasonable basis for their conduct and that all of Chubb's actions would proximately injure, damage and create loss and harm to VSP.

92.    Defendants tortuously breached the duty of good faith and fair dealing owed to VSP because Chubb's actions were conscious and deliberate and, as a result, unfairly frustrated and disappointed VSP's reasonable expectations of Chubb as VSP's insurer.

93.    Chubb made a conscious and deliberate decision to (i) advance unreasonable interpretations of the Policy to avoid providing coverage under the Policy as required; (ii) knowingly and deliberately favor its own economic interests by failing to provide coverage as required under the Policy for VSP's COVID-19-related losses notwithstanding the significant financial losses VSP has sustained; (iii) fail to timely and reasonably investigate all bases for coverage; and (iv) decline coverage to VSP for its COVID-19-related business losses despite the

BUCHALTER
A PROFESSIONAL CORPORATION
NAPA

BN 69085392V4

**COMPLAINT FOR DAMAGES AND OTHER RELIEF**

Policy requirements and Policy language obligating Chubb to do so.

94.     The unreasonable and bad faith conduct committed by Defendants amounts to institutional bad faith on the part of Chubb that is part of a repeated pattern of unfair claim settlement practices contrary to the customs and practices of insurers conducting lawful business activities within this State, and are not an isolated occurrence.  This pattern of unfair claim settlement practices constitutes a conscious course of wrongful conduct that is firmly grounded in established company policy on the part of Chubb and its affiliated and member companies.

95.     On information and belief, Defendants' institutional bad faith, including the bad faith practices of Chubb, includes but is not limited to using the claims department claims personnel to achieve a certain number or certain percentage of claim denials per year in order to save money and increase profits and engaging in unreasonable and revisionist interpretations of policy provisions that are contrary to the coverage originally underwritten and purchased.  Defendants engage in such conduct for the purpose of delaying and denying legitimate claims for losses due under the policies of insurance issued without any reasonable or objective basis to do so, and solely for the purpose of frustrating the prompt and expeditious payment of legitimate claims of covered losses.

96.     As a direct and proximate result of the aforementioned unreasonable conduct of Defendants, including Chubb, VSP has suffered and will continue to suffer financial losses and damages in order to pay, *entirely on its own and without any assistance from its insurer*, covered financial losses and remediation costs to "remove," "neutralize" and "immobilize" the presence of the SARS-Cov-2 virus at its business locations so VSP could safely re-open its business locations following the total suspension of operations.  VSP's damages include, but are not limited to, the amount of covered insurance benefits that were due under the Policy and improperly withheld, and other general and special damages according to proof at trial.

97.     As a further proximate result of the aforementioned bad faith conduct of Defendants, including Chubb, VSP was compelled to retain legal counsel, including counsel of record in this case Buchalter, A Professional Corporation, in order to obtain the full amounts of benefits that were

BUCHALTER
A PROFESSIONAL CORPORATION
NAPA

BN 69085392V4

due and owing under the Policy and California law.

98.    Defendants have tortuously withheld from VSP benefits due under the Policy, and consistent with the holding of *Brandt v. Superior Court* (1985) 37 Cal. 3d 813, Plaintiff is entitled to recoup from Defendants its reasonable and necessary attorneys' fees, witness fees and other costs of litigation expended to recover such benefits.

99.    Defendants' conduct described herein was done with a conscious disregard of VSP's rights and with the intent to vex, injure or annoy VSP such as to constitute oppression, fraud or malice within the meaning of California Civil Code §3294 and thereby entitling Plaintiff to punitive and exemplary damages in an amount to punish or set an example of Defendants.  Defendants intended by their conduct to cause financial loss and injury to VSP and were engaged in such despicable conduct that was carried out with a willful and conscious disregard of VSP's rights. Alternatively, the conduct of Chubb constituted an intentional misrepresentation, deceit, withholding or concealment of material facts known to the insurer without the intention of paying legitimate claims and with the intention of depriving VSP of its entitlement to full coverage necessary to remediate its covered locations and recover from its business interruption losses.

### THIRD CAUSE OF ACTION
### (DECLARATORY RELIEF)

100.    Plaintiff realleges and incorporates as though set forth at length and in full all facts and allegations stated in Paragraphs 1 through 99, inclusive, above.

101.    Under California Code of Civil Procedure section 1060 *et seq*. this court is invested with the inherent and equitable power to declare the rights and obligations of the parties arising under contracts or the law of this State, including without limitation the rights and obligations of the parties under this Policy, whether or not other relief is or could be claimed in this action.

102.    An actual controversy has arisen between Plaintiff, on one hand, and Chubb, on the other hand, as to the rights, duties, responsibilities and obligations of the Parties under the Policy. Plaintiff contends that the release and presence of the SARS-Cov-2 virus in the air and on the

**COMPLAINT FOR DAMAGES AND OTHER RELIEF**

BUCHALTER
A PROFESSIONAL CORPORATION
NAPA

BN 69085392V4

surfaces of its retail locations, laboratories and corporate offices constitutes a "pollution condition" under the Policy such that the remediation costs and business interruption losses suffered by VSP are covered "Loss" under the Policy that is due and owing.  Chubb has failed to provide any coverage for this "Loss" and instead disputes any coverage owing under the "Policy" by concluding, *inter alia*, that the contamination and alteration of surfaces and the air caused by the SARS-Cov-2 virus is not a "Pollution Condition."

103.   Under Insuring Agreement A of the Policy, Defendants are obligated to "pay on behalf of the 'insured' for 'loss', in excess of the 'self-insured retention' or deductible period (as applicable) resulting from:

> "Claims" and "first-party claims" arising out of: 1) a "pollution condition" on, at, under or migrating from a "covered location" … provided the claim is first made, or the "insured" first discovers the "pollution condition" … that is the subject of such "first party claim," during the "policy period."

104.   The Policy broadly defines, in relevant part, a "Pollution Condition" as:

> The discharge, dispersal, release, escape, migration, or seepage of ***any*** solid, liquid, gaseous, or thermal ***irritant, contaminant, or pollutant***, including soil, silt, sedimentation, smoke, soot, vapors, fumes, acids, alkalis, chemical, electromagnetic fields (EMFs), hazardous substances, hazardous materials, waste materials, "low-level radioactive waste", "mixed waste" and medical, red bag, ***infectious or pathological wastes*** on, in, into or upon land and structures thereupon, the atmosphere, surface water, or groundwater.

Policy at Section V., Definitions, Para. LL (emphasis added).

105.   With respect to "pollution conditions" at a "covered location," "Loss" under the Policy is defined to include, in relevant part, "First-party remediation costs" and "Business interruption loss."

106.   There is no exclusion under the Policy for "Loss" caused by, or arising out of, or related to viruses such as coronavirus or COVID-19.

107.   Plaintiff regularly advised Defendants that their failure to fully compensate Plaintiff for this covered "Loss" was contrary to their obligations under the Policy and California law.

108.   Plaintiff desires a judicial determination and declaration that Defendants are obligated under the Policy and California law to compensate VSP for the full value of its Claim, including but not limited to its remediation costs and business interruption loss, which are in the

**COMPLAINT FOR DAMAGES AND OTHER RELIEF**

1  hundreds of millions.

2  109.   A judicial declaration of Defendants' coverage obligations owed to Plaintiff is

3  necessary and appropriate at this time because Plaintiff has incurred extensive costs to remediate

4  its locations *on its own* without the insurer's assistance and Defendants continue to deny Plaintiff's

5  requests for compensation of same as owed under the Policy.

6  **FOURTH CAUSE OF ACTION**

7  **(SPECIFIC PERFORMANCE)**

8  110.   Plaintiff realleges and incorporates as though set forth at length and in full all facts

9  and allegations stated in Paragraphs 1 through 109, inclusive, above.

10  111.   Plaintiff is insured by Defendants under a specifically enforceable contract

11  sufficiently certain in its term—the Policy. (*See* Exhibit A).

12  112.   At all pertinent times, the required premiums were paid with respect to the Policy,

13  and the Policy was in full force and effect.  Thus, Defendants received adequate consideration for

14  the Policy.

15  113.   The provisions of the Policy requiring Defendants to compensate Plaintiff for the

16  full value of covered "Loss" are just and reasonable.

17  114.   Since tender of the Claim, Defendants have refused to compensate Plaintiff for the

18  full value of the covered "Loss" sustained, thereby necessitating Plaintiff to retain counsel to protect

19  its interests.

20  115.   Defendants have breached their contractual obligations owed to Plaintiff under the

21  Policy by failing to compensate Plaintiff for the full value of covered losses sustained.

22  116.   If Defendants do not provide Plaintiff with payment of Plaintiff's covered losses,

23  Plaintiff will be irreparably harmed.  Indeed, any further delay in reimbursement of these covered

24  losses stands to increase financial prejudice to the Plaintiff who has incurred and carried these costs

25  since March of 2020.  Therefore, Plaintiff has no adequate remedy at law in that it will be deprived

26  of the benefits Defendants promised to provide by accepting Plaintiff's premiums—i.e., the

27  contemporaneous provision of insurance coverage reimbursement for, *inter alia*, remediation costs

28

**COMPLAINT FOR DAMAGES AND OTHER RELIEF**

BUCHALTER
A PROFESSIONAL CORPORATION
NAPA

BN 69085392V4

and business interruption loss.

117.   The covered losses sustained by Plaintiff in connection with the Claim are in the hundreds of millions, exclusive of interest accruing thereon.  As a result of Defendants' continuing refusal to pay the full value of these covered losses, Plaintiff has been forced to independently and exclusively shoulder these liabilities.

## **PRAYER FOR RELIEF**

Now, therefore, Plaintiff prays for judgment against Defendants on this complaint as follows:

1.   On the first and second causes of action, for the full amount of the covered benefits due under the Policy, plus interest at the maximum legally permissible rate from the date incurred, in an amount not less than the $5 million Aggregate Policy Limit;

2.   On the second cause of action, for Plaintiff's general and special damages, including damages for prejudgment interest owing to any breach of the duty of good faith and fair dealing or any of Defendants' malice, oppression, or fraud, in an amount to be determined at trial;

3.   On the second cause of action, upon a finding of bad faith, for the amount of attorney fees, witness fees and other litigation costs actually incurred by Plaintiff pursuant to *Brandt v. Superior Court* (1985) 37 Cal.3d 813 in such amounts that are deemed to be reasonable and necessary to recover the full covered benefits due and owing under the Policy.

4.   On the second cause of action for punitive and exemplary damages to the extent Chubb is determined to have committed acts and engaged in conduct that was oppressive, malicious or fraudulent in breach of its duty of good faith and fair dealing in such amount sufficient to punish and deter such conduct in the future.

5.   On the third cause of action, for a declaration of the parties' rights and obligations owing to each other under the Policy in regard to the remediation costs and business interruption costs incurred by Plaintiff in response to the COVID-19 pandemic.

6.   On the fourth cause of action, for specific performance of Defendants' coverage obligations owed to Plaintiff, including the immediate payment of all covered losses incurred to

**COMPLAINT FOR DAMAGES AND OTHER RELIEF**

BUCHALTER
A PROFESSIONAL CORPORATION
NAPA

BN 69085392V4

date.

7.   On all causes of action, for Plaintiff's lawful costs of suit incurred herein;

8.    On all causes of action, prejudgment interest for all damages; and

9.   Such other and further relief as the court deems just and proper.

DATED:  March 16, 2022

BUCHALTER
A Professional Corporation

By: _____
    Harry W.R. Chamberlain II
    Cecilia O. Miller
    Zhasmina Kolarova

    Attorneys for Plaintiff
    VISION SERVICE PLAN

**COMPLAINT FOR DAMAGES AND OTHER RELIEF**

BUCHALTER
A PROFESSIONAL CORPORATION
NAPA

BN 69085392V4

# JURY DEMAND

Plaintiff hereby demands a jury trial on all causes of action that can be heard and determined by jury.

DATED:  March 16, 2022

BUCHALTER
A Professional Corporation

By:_____
Harry W.R. Chamberlain II
Cecilia O. Miller
Zhasmina Kolarova

Attorneys for Plaintiff
VISION SERVICE PLAN

# EXHIBIT A

**CHUBB**®

**Premises Pollution Liability
Insurance Policy**

**Illinois Union Insurance Company
Chicago, Illinois**

### *Declarations*

**This Policy is issued by the stock insurance company identified above (hereinafter *the Insurer*).**

**THIS POLICY PROVIDES LIABILITY COVERAGE ON A CLAIMS-MADE AND REPORTED BASIS, WHICH COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND REPORTED TO THE INSURER, IN WRITING, DURING THE POLICY PERIOD OR WITHIN THIRTY DAYS THEREAFTER, UNLESS AN EXTENDED REPORTING PERIOD APPLIES. THIS POLICY ALSO PROVIDES FIRST-PARTY COVERAGES ON A DISCOVERED AND REPORTED BASIS, WHICH COVERS ONLY POLLUTION CONDITIONS AND INDOOR ENVIRONMENTAL CONDITIONS, AS APPLICABLE, FIRST DISCOVERED DURING THE POLICY PERIOD AND FOR WHICH A FIRST-PARTY CLAIM IS REPORTED TO THE INSURER, IN WRITING, DURING THE POLICY PERIOD OR WITHIN THIRTY DAYS THEREAFTER. FINALLY, THIS POLICY PROVIDES COVERAGE FOR EMERGENCY RESPONSE COSTS THAT IS LIMITED BY MORE SPECIFIC REPORTING CRITERIA AND COVERS ONLY EMERGENCY RESPONSE COSTS INCURRED, AND REPORTED TO THE INSURER, IN WRITING, WITHIN THE SPECIFIC TIMING REQUIREMENTS IDENTIFIED IN THIS POLICY.  PLEASE READ THIS POLICY CAREFULLY. SOME OF THE PROVISIONS CONTAINED IN THIS POLICY RESTRICT COVERAGE, SPECIFY WHAT IS AND IS NOT COVERED AND DESIGNATE YOUR RIGHTS AND DUTIES.  LEGAL DEFENSE EXPENSES ARE SUBJECT TO AND SHALL ERODE THE LIMITS OF LIABILITY AND ANY APPLICABLE SELF-INSURED RETENTION.**

**THE DECLARATIONS, TOGETHER WITH THE COMPLETED AND SIGNED APPLICATION, THIS POLICY, AND ANY ENDORSEMENTS OR SCHEDULES ATTACHED HERETO, CONSTITUTE THE INSURANCE POLICY.**

| **Policy No.:** PPL G71469268 002 | **Renewal of:** G71469268 001 |
|---|---|

| **Item 1.** | **First Named Insured:** Vision Service Plan (VSP) | |
|---|---|---|
| | **Address:** | 333 Quality Dr<br>Rancho Cordova, California 95670 |

**Coverages Purchased: Coverage A. -** [X]  **Coverage B. -** [X]  **Coverage C. -** [X]
("X" Indicates Coverage Purchased)

| **Item 2.** | **Policy Period:**<br><br>(Local Time of the Address Shown in Item **1.**, above.) | **Policy Inception Date:**<br><br>12/10/2019 12:01 A.M. | **Policy Expiration Date:**<br><br>12/10/2020 12:01 A.M. |
|---|---|---|---|
| **Item 3.** | **Limits of Liability:**<br>In U.S. Dollars | **a.** $3,000,000 | Per Pollution Condition or Indoor Environmental Condition Limit of Liability |
| | | **b.** $5,000,000 | Total Policy and Program Aggregate Limit of Liability for all Pollution Conditions and Indoor Environmental Conditions |
| **Item 4.** | **Self-Insured Retention / Deductible Period:**<br>In U.S. Dollars | **a.** $50,000 | Per Pollution Condition or Indoor Environmental Condition |
| | | **b.**  3 | Days Per Pollution Condition or Indoor Environmental Condition |

| Item 5. | Retroactive Dates: | |
|---|---|---|
| | | ☐ if checked Exposure-Specific Retroactive Dates are designated via endorsement. |

**Coverage A**

Premises Pollution Condition Liability: Per PF-44913 (09/14)

Premises Indoor Environmental Condition Liability: Per PF-44913 (09/14)

Premises Pollution Condition First-Party Claims: Per PF-44913 (09/14)

Premises Indoor Environmental Condition First-Party Claims: Per PF-44913 (09/14)

**Coverage B**

Transportation Liability: Per PF-44913 (09/14)

Transportation First-Party Claims: Per PF-44913 (09/14)

**Coverage C**

Non-Owned Disposal Sites Liability : Per PF-44913 (09/14)

If **"FULL RETRO"** is indicated in the Retroactive Date column above, then retroactive coverage is afforded pursuant to this Policy for that specific exposure, subject to any other corresponding exposure-specific Retroactive Date added to this Policy by endorsement.

| Item 6. | **Premium:** In U.S. Dollars | $28,750 |
|---|---|---|
| | **Total Premium:** | $28,750 |
| | | (The entire amount of this premium shall be 25% minimum earned as of the first day of the Policy Period indicated in Item **2.**, above) |

| Item 7. | **Producer:** Name & Address | Lockton Insurance Brokers LLC 777 South Figueroa St, 52nd Fl Los Angeles, California 90017 |
|---|---|---|

| Item 8. | **a. Notice of Claim or Pollution Condition** | **b. All other Notices** |
|---|---|---|
| **Notices** | CHUBB Environmental Risk Claims Manager CHUBB USA Claims P.O. Box 5103 Scranton, PA 18505-0510 Fax: (866) 635-5687  First Notice Fax: (800) 951-4119 First Notice Email: CasualtyRiskEnvironmentalFirstNotice@chubb.com | Environmental Risk Underwriting Officer CHUBB Environmental Risk P.O. Box 1000 436 Walnut Street – WA 07A Philadelphia, PA 19106 |

| | **Environmental Incident Alert - 24 Hour Emergency Response Hotline** | **1-888-310-9553** |
| --- | --- | --- |

| **Item 9.** | **Covered Locations:** | As per PF- 44913<br><br>☐ if checked here, schedule of Covered Locations is designated via endorsement. |
| --- | --- | --- |

**Policy Form No.**  PF-44887b (08/18) Premises Pollution Liability Insurance Policy

**Endorsements and Notices Attached at Policy Issuance:**

| Endorsement Number: | Form Number: | Form Name: |
|---|---|---|
| 001 | PF-44953 (09/14) | Named Insureds (Broad - Controlled Chain) Endorsement |
| 002 | PF-44891 (09/14) | Schedule of Additional Insureds (Broad) Endorsement |
| 003 | PF-32460 (11/10) | Schedule of Named Insured Endorsement |
| 004 | PF-44893 (09/14) | Aggregated Self-Insured Retention Endorsement |
| 005 | PF-48605 (01/17) | Asbestos and/or Lead-Based Paint Coverage (Inadvertent Disturbance) Endorsement |
| 006 | PF-44917 (09/14) | Dedicated Defense Aggregate Limit Endorsement |
| 007 | PF-48635 (01/17) | Evacuation Expense Coverage Endorsement |
| 008 | PF-48637 (01/17) | First-Party Property Value Diminution Coverage Endorsement |
| 009 | PF-51291 (10/18) | Global Program Solutions (Indemnity Only Outside Of The United States) Endorsement |
| 010 | PF-44957 (09/14) | Notice of Cancellation Amendatory (Generic Time Frame) Endorsement |
| 011 | PF-44963 (09/14) | Other Insurance (Primary) Endorsement |
| 012 | PF-44967 (09/14) | Premium Earn-Out (Staggered - One Year - Acceleration) Endorsement |
| 013 | PF-44913 (09/14) | Schedule of Covered Locations Schedule Endorsement |
| 014 | PF-48666 (01/17) | Supplementary Payments Amendatory Endorsement |
| 015 | SL-34255a (01/16) | Service of Suit Endorsement |
| 016 | ALL-21101 (11/06) | Trade Or Economic Sanctions Endorsement |
| 017 | LD-5S23j (03/14) | Signatures |
|  | SL-17888 (01/17) | California Surplus Lines Notification |
|  | TRIA24 (01/15) | Policyholder Disclosure Notice of Terrorism Insurance Coverage |
|  | ALL-20887a (03/16) | Chubb Producer Compensation Practices & Policies |
|  | ILP 001 01 04 | U. S. Treasury Department's Office of Foreign Assets Control ("OFAC") Advisory Notice to Policyholders |

**IN WITNESS WHEREOF, the Insurer has caused this Policy to be countersigned by a duly authorized representative of the Insurer.**

JOHN J. LUPICA, President

**DATE:** _____12/10/2019_____
MO/DAY/YR

AUTHORIZED REPRESENTATIVE

PF- 44886a (01/17)

# CHUBB®

**Premises Pollution Liability
Insurance Policy**

**This Policy is issued by the stock insurance company identified in the Declarations (hereinafter *the Insurer*).**

**THIS POLICY PROVIDES LIABILITY COVERAGE ON A CLAIMS-MADE AND REPORTED BASIS, WHICH COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND REPORTED TO THE INSURER, IN WRITING, DURING THE POLICY PERIOD OR WITHIN THIRTY DAYS THEREAFTER, UNLESS AN EXTENDED REPORTING PERIOD APPLIES. THIS POLICY ALSO PROVIDES FIRST-PARTY COVERAGES ON A DISCOVERED AND REPORTED BASIS, WHICH COVERS ONLY POLLUTION CONDITIONS AND INDOOR ENVIRONMENTAL CONDITIONS, AS APPLICABLE, FIRST DISCOVERED DURING THE POLICY PERIOD AND FOR WHICH A FIRST-PARTY CLAIM IS REPORTED TO THE INSURER, IN WRITING, DURING THE POLICY PERIOD OR WITHIN THIRTY DAYS THEREAFTER. FINALLY, THIS POLICY PROVIDES COVERAGE FOR EMERGENCY RESPONSE COSTS THAT IS LIMITED BY MORE SPECIFIC REPORTING CRITERIA AND COVERS ONLY EMERGENCY RESPONSE COSTS INCURRED, AND REPORTED TO THE INSURER, IN WRITING, WITHIN THE SPECIFIC TIMING REQUIREMENTS IDENTIFIED IN THIS POLICY. PLEASE READ THIS POLICY CAREFULLY. SOME OF THE PROVISIONS CONTAINED IN THIS POLICY RESTRICT COVERAGE, SPECIFY WHAT IS AND IS NOT COVERED AND DESIGNATE YOUR RIGHTS AND DUTIES. LEGAL DEFENSE EXPENSES ARE SUBJECT TO AND SHALL ERODE THE LIMITS OF LIABILITY AND ANY APPLICABLE SELF-INSURED RETENTION**.

Throughout this Policy the words *the Insurer* shall refer to the company providing this insurance. Other words and phrases that appear in quotation marks have special meanings and are defined in Section **V., DEFINITIONS**.

In consideration of the payment of the premium and in reliance upon all statements made in the Application to this Policy, including the information furnished in connection therewith, and subject to all terms, definitions, conditions, exclusions and limitations of this Policy, the Insurer agrees to provide insurance coverage to the "insured" as described herein.

## I. INSURING AGREEMENTS

Solely to the extent that the coverages below are identified on the Declarations to this Policy as being underwritten by the Insurer, the Insurer agrees to pay on behalf of the "insured" for "loss", in excess of the "self-insured retention" or deductible period (as applicable), resulting from:

**A.** POLLUTION CONDITIONS OR INDOOR ENVIRONMENTAL CONDITIONS COVERAGE (Coverage **A.**)

"Claims" and "first-party claims" arising out of: **1)** a "pollution condition" on, at, under or migrating from a "covered location"; or **2)** an "indoor environmental condition" at a "covered location", provided the "claim" is first made, or the "insured" first discovers the "pollution condition" or "indoor environmental condition" that is the subject of such "first-party claim", during the "policy period". Any such "claim" or "first-party claim" must be reported to the Insurer, in writing, during the "policy period" or within thirty (30) days after the expiration of the "policy period", or during any applicable "extended reporting period".

The coverage afforded pursuant to this Coverage **A.** only applies to "pollution conditions" or "indoor environmental conditions" that first commence, in their entirety, on or after the retroactive date identified in Item **5.** of the Declarations, if applicable, and prior to the expiration of the "policy period".

**B.** TRANSPORTATION COVERAGE (Coverage **B.**)

"Claims" and "first-party claims" arising out of a "pollution condition" resulting from "transportation", provided the "claim" is first made, or the "insured" first discovers the "pollution condition" that is the subject of such "first-party claim", during the "policy period". Any such "claim" or "first-party claim" must be reported to the Insurer, in writing, during the "policy period" or within thirty (30) days after the expiration of the "policy period", or during any applicable "extended reporting period".

The coverage afforded pursuant to this Coverage **B.** only applies to "pollution conditions" that first commence, in their entirety, on or after the retroactive date identified in Item **5.** of the Declarations, if applicable, and prior to the expiration of the "policy period".

CHUBB®

**Premises Pollution Liability
Insurance Policy**

**C.** NON-OWNED DISPOSAL SITE COVERAGE (Coverage **C.**)

"Claims" arising out of a "pollution condition" on, at, under or migrating from a "non-owned disposal site", provided the "claim" is first made during the "policy period". Any such "claim" must be reported to the Insurer, in writing, during the "policy period" or within thirty (30) days after the expiration of the "policy period", or during any applicable "extended reporting period".

The coverage afforded pursuant to this Coverage **C.** only applies to "pollution conditions" that are attributable to a "named insured's" waste generated at a "covered location" and received at the "non-owned disposal site", in its entirety, on or after the retroactive date identified in Item **5.** of the Declarations, if applicable, and prior to the expiration of the "policy period".

## II. LIMITS OF LIABILITY AND SELF-INSURED RETENTION

**A.** It is expressly agreed that the Insurer's obligation to pay for any covered "loss" (exclusive of "business interruption loss") pursuant to this Policy shall attach to the Insurer only after the "first named insured" has paid, or has provided evidence to the Insurer that another "named insured" has paid, the full amount of the "self-insured retention" with respect to any covered "pollution condition" or "indoor environmental condition". Under no circumstances, including, but not limited to, an "insured's" insolvency and/or bankruptcy, shall the Insurer be liable to pay any amount within the "self-insured retention". In the event that the "first named insured" cannot provide satisfactory evidence that a "named insured" has paid the full amount of the "self-insured retention" with respect to any covered "pollution condition" or "indoor environmental condition", the "first named insured" shall remain responsible to pay the "self-insured retention" before the Insurer's payment obligation pursuant to this Policy shall attach with respect to coverage sought by any "insured".

Notwithstanding the foregoing, if the "insured" agrees with the Insurer to use "mediation" to successfully resolve any "claim" for which "legal defense expenses" have been incurred, then the "self-insured retention" applicable to the "pollution condition" or "indoor environmental condition" that corresponds to such "claim" shall be reduced by fifty percent (50%), subject to a maximum reduction in the "self-insured retention" of twenty-five thousand dollars ($25,000).

In addition to the foregoing, it is expressly agreed that the Insurer's obligation to pay for any covered "business interruption loss" pursuant to this Policy shall attach to the Insurer only after the relevant "insured" has also borne the full amount of the "business interruption loss" within the deductible period identified in Item **4.** of the Declarations to this Policy.

**B.** One "self-insured retention" shall apply to all "loss" (exclusive of "business interruption loss") arising out of the same, continuous, repeated, or related "pollution condition" or "indoor environmental condition". If the same, continuous, repeated, or related "pollution condition" or "indoor environmental condition" triggers coverage pursuant to multiple coverage parts, or otherwise involves multiple exposures that have been assigned exposure-specific "self-insured retention" amounts by endorsement to this Policy, the single largest of the associated "self-insured retention" amounts identified in: **1)** Item **4.** of the Declarations; **2)** any Supplemental Coverage added by endorsement to this Policy; or **3)** any exposure-specific "self-insured retention" endorsement identified as part of this Policy, shall apply to all "loss" and other covered exposures arising out of such "pollution condition" or "indoor environmental condition", except for any "catastrophe management costs" that are assigned an exposure-specific "self-insured retention" by endorsement to this Policy, if any (hereinafter Catastrophe Management-Specific SIR Obligation). Amounts within any such Catastrophe Management-Specific SIR Obligation shall be independent of, and shall not otherwise erode, the single largest "self-insured retention" applicable to all other covered exposures arising out of the same "pollution condition" or "indoor environmental condition" as contemplated herein.

**C.** One deductible period shall apply to all "business interruption loss" arising out of the same, continuous, repeated, or related "pollution condition" or "indoor environmental condition".

**D.** Subject to Subsections **E.** and **F.**, below, the most the Insurer shall pay for all "loss" arising out of the same, continuous, repeated, or related "pollution condition" or "indoor environmental condition" is the Per Pollution Condition or Indoor Environmental Condition Limit of Liability identified in Item **3.a.** of the Declarations to this Policy.

**E.** Subject to Subsection **D.**, above, and Subsection **F.**, below, **$250,000** shall be the maximum amount the Insurer shall pay for all "catastrophe management costs" arising out of all "pollution conditions" and "indoor environmental conditions".

**F.** Subject to Subsections **D.** and **E.**, above, the Total Policy and Program Aggregate Limit of Liability identified in Item **3.b.** of the Declarations shall be the maximum liability of the Insurer pursuant to this Policy with respect to all "loss".

**G.** If the Insurer or an affiliate has issued pollution liability coverage afforded on a discovered and reported basis or claims-made and reported basis consistent with coverage afforded pursuant to this Policy in one or more policy periods, and a "pollution condition" or "indoor environmental condition" is first discovered and reported to the Insurer, or a "claim" is first made and reported to the Insurer with respect to a "pollution condition" or "indoor environmental condition", in accordance with the terms and conditions of this Policy, then:

    **1.** Any continuous, repeated, or related "pollution condition" or "indoor environmental condition" that is subsequently reported to the Insurer during later policy periods shall be deemed to be one "pollution condition" or "indoor environmental condition" discovered during this "policy period"; and

    **2.** All "claims" arising out of:

        **a.** The same, continuous, repeated, or related "pollution condition" or "indoor environmental condition" that was discovered during this "policy period"; or

        **b.** The same, continuous, repeated, or related "pollution condition" or "indoor environmental condition" that was the subject of a "claim" first made and reported in accordance with the terms and conditions of this Policy,

shall be deemed to have been first made and reported during this "policy period" and no other policy shall respond.

## III. DEFENSE AND SETTLEMENT

**A.** The Insurer shall have the right and, subject to the "self-insured retention" obligation, the duty to defend the "insured" against a "claim" to which this insurance applies.  The Insurer shall have no duty to defend the "insured" against any "claim" to which this insurance does not apply.  The Insurer's duty to defend the "insured" ends once the Limits of Liability are exhausted or are tendered into a court of applicable jurisdiction, or once the "insured" refuses a settlement offer as provided in Subsection **E.,** below.

**B.** The Insurer shall have the right to select legal counsel to: **1)** represent the "insured" for the investigation, adjustment, and defense of any "claims" covered pursuant to this Policy; and **2)** assist the "insured" with clarifying the extent of, and to help minimize, any "first-party remediation costs".  Selection of legal counsel by the Insurer shall not be done without the consent of the "insured"; such consent shall not be unreasonably withheld.

In the event the "insured" is entitled by law to select independent counsel to defend itself at the Insurer's expense, the attorney fees and all other litigation expenses the Insurer shall pay to that counsel are limited to the rates the Insurer actually pays to counsel that the Insurer normally retains in the ordinary course of business when defending "claims" or lawsuits of similar complexity in the jurisdiction where the "claim" arose or is being defended.  In addition, the "insured" and the Insurer agree that the Insurer may exercise the right to require that such counsel: **1)** have certain minimum qualifications with respect to their competency, including experience in defending "claims" similar to those being asserted against the "insured"; **2)** maintain suitable errors and omissions insurance coverage; **3)** be located within a reasonable proximity to the jurisdiction of the "claim"; and **4)** agree in writing to respond in a timely manner to the Insurer's requests for information regarding the "claim".  The "insured" may at any time, by its signed consent, freely and fully waive its right to select independent counsel.

**C.** The "insured" shall have the right and the duty to retain a qualified environmental consultant or "catastrophe management firm" to: **1)** perform any investigation and/or remediation of any "pollution condition" or "indoor environmental condition" covered pursuant to this Policy; or **2)** perform "catastrophe management services" covered pursuant to this Policy, respectively.  The "insured" must

CHUBB®

**Premises Pollution Liability
Insurance Policy**

receive the consent of the Insurer prior to the selection and retention of such consultant or "catastrophe management firm", except in the event of a "first-party claim" that results in "emergency response costs".

**D.** "Legal defense expenses" reduce the Limits of Liability identified in the Declarations to this Policy, and, unless specifically stated otherwise herein, any applicable Limits or Sublimits of Liability identified in any endorsement hereto. "Legal defense expenses" shall also be applied to the "self-insured retention".

**E.** The Insurer shall present all settlement offers to the "insured". If the Insurer recommends a settlement which is acceptable to a claimant, exceeds any applicable "self-insured retention", is within the Limits of Liability, and does not impose any additional unreasonable burdens on the "insured", and the "insured" refuses to consent to such settlement offer, then the Insurer's duty to defend shall end. Thereafter, the "insured" shall defend such "claim" independently and at the "insured's" own expense. The Insurer's liability shall not exceed the amount for which the "claim" could have been settled if the Insurer's recommendation had been accepted, exclusive of the "self-insured retention".

## IV. COVERAGE TERRITORY

The coverage afforded pursuant to this Policy shall only apply to "pollution conditions" or "indoor environmental conditions" located, and "claims" made, within the United States of America.

## V. DEFINITIONS

**A.** **"Additional insured"** means any person or entity specifically endorsed onto this Policy as an "additional insured", if any. Such "additional insured" shall maintain only those rights that are specified by endorsement to this Policy.

**B.** **"Adverse media coverage"** means national or regional news exposure in television, radio, print or internet media that is reasonably likely to have a negative impact on the "insured" with respect to its income, reputation, community relations, public confidence or good will.

**C.** **"Bodily injury"** means physical injury, illness, disease, mental anguish, emotional distress, or shock, sustained by any person, including death resulting therefrom, and any prospective medical monitoring costs that are intended to confirm any such physical injury, illness or disease.

**D.** **"Business income"** means:

**1.** Net profit or loss, before income taxes, including "rental income" from tenants, that would have been realized had there been no "business interruption";

**2.** The "insured's" continuing operating and payroll expense (excluding payroll expense of officers, executives, department managers and contract employees);

**3.** Costs incurred by the "insured" as rent for temporary premises when a portion of a "covered location" becomes untenantable due to a "pollution condition" or "indoor environmental condition" and temporary premises are required to continue the "insured's" operations. Such rental costs cannot exceed the fair rental value of the untenantable portion of the "covered location" immediately preceding the "pollution condition" or "indoor environmental condition".

**E.** **"Business interruption"** means the necessary partial or complete suspension of the "insured's" operations at a "covered location" for a period of time, which is directly attributable to a "pollution condition" or "indoor environmental condition" to which Coverage **A.** of this Policy applies. Such period of time shall extend from the date that the operations are necessarily suspended and end when such "pollution condition" or "indoor environmental condition" has been remediated to the point at which the "insured's" normal operations could reasonably be restored.

**F.** **"Business interruption loss"** means:

**1.** "Business income";

**2.** "Extra expense"; and

**3.** "Delay expense".

CHUBB®

**Premises Pollution Liability
Insurance Policy**

G.  **"Catastrophe management costs"** means reasonable and necessary expenses approved by the Insurer, in writing, except for those expenses incurred during the same seven (7) day period associated with "emergency response costs", which have been incurred by the "insured" for the following:

1.  Responsive consulting services rendered by a "catastrophe management firm";

2.  Printing, advertising, mailing of materials of public relations materials;

3.  Travel by directors, officers, employees or agents of the "insured", or the "catastrophe management firm", incurred at the direction of a "catastrophe management firm";

4.  To secure the scene of a "pollution condition" or "indoor environmental condition"; or

5.  Sums advanced to third-parties directly harmed by the "pollution condition" or "indoor environmental condition" for their medical costs; funeral costs; psychological counseling; travel expenses costs; temporary living costs or other necessary response costs,

but solely in those instances when, in the good faith opinion of a "key executive", the associated "pollution condition" or "indoor environmental condition" has resulted in or is reasonably likely to result in: **a)** "loss" (exclusive of "catastrophe management costs") that will exceed the applicable "self-insured retention"; and **b)** a need for "catastrophe management services" due to "adverse media coverage".

**"Catastrophe management costs"** do not include any "legal defense expense".

H.  **"Catastrophe management firm"** means any firm that is approved, in writing, except for firms retained for the same seven (7) day period associated with "emergency response costs", by the Insurer to perform "catastrophe management services" in connection with a "pollution condition" or "indoor environmental condition".

I.  **"Catastrophe management services"** means advising the "insured" with respect to minimizing potential harm to the "insured" from a covered "pollution condition" or "indoor environmental condition" by managing "adverse media coverage" and maintaining and restoring public confidence in the "insured", and its services or products.

J.  **"Claim"** means the written assertion of a legal right received by the "insured" from a third-party, or from another "insured" that is party to an "environmental indemnity obligation", including, but not limited to, a "government action", suits or other actions alleging responsibility or liability on the part of the "insured" for "bodily injury", "property damage" or "remediation costs" arising out of "pollution conditions" or "indoor environmental conditions" to which this insurance applies.

K.  **"Covered location"** means:

1.  Any location specifically identified in Item **9.** of the Declarations to this Policy;

2.  Any location that is specifically identified on a Schedule of Covered Locations attached to this Policy; and

3.  Any location that meets the prerequisites to coverage identified in the Automatic Acquisition and Due Diligence Endorsement attached to this Policy, if any.

L.  **"Delay expense"** means, for a "covered location" under development where a "pollution condition" or "indoor environmental condition" causes a delay in the completion or development during the "business interruption", any of the following expenses:

1.  Additional interest on money the "insured" has borrowed to finance the construction, development, or remediation of a project at a "covered location";

2.  Additional realty taxes and other assessments;

3.  Additional advertising or promotional expense;

4.  Additional expenses incurred resulting from the renegotiation of leases, including associated usual and customary legal representation expense; and

5.  Additional engineering, architectural, and consulting fees.

**M.** **"Emergency response costs"** means "first-party remediation costs" incurred within seven (7) days following the discovery of a "pollution condition" or "indoor environmental condition" by a "responsible person" in order to abate or respond to an imminent and substantial threat to human health or the environment arising out of:

   **1.** A "pollution condition" or "indoor environmental condition" on, at, under or migrating from a "covered location"; or

   **2.** A "pollution condition" resulting from "transportation",

provided such "emergency response costs" are reported to the Insurer within fourteen (14) days of when that "responsible person" first became aware of such "pollution condition" or "indoor environmental condition".

**N.** **"Environmental indemnity obligations"** means an "insured's" obligations to defend or indemnify a third-party with respect to a "pollution condition" or "indoor environmental condition" to which this insurance otherwise applies, provided that such defense or indemnity obligation is explicitly included within a contract identified or described on the Schedule of Insured Contracts Endorsement attached to this Policy, if any.

**O.** **"Environmental law"** means any Federal, state, commonwealth, municipal or other local law, statute, ordinance, rule, guidance document, regulation, and all amendments thereto (collectively Laws), including voluntary cleanup or risk-based corrective action guidance, or the direction of an "environmental professional" acting pursuant to the authority provided by any such Laws, along with any governmental, judicial or administrative order or directive, governing the liability or responsibilities of the "insured" with respect to a "pollution condition" or "indoor environmental condition".

**P.** **"Environmental professional"** means a licensed professional that is:

   **1.** Mutually agreed upon by the Insurer and the "insured", except with respect to "emergency response costs"; and

   **2.** Qualified by licensure, knowledge, skill, education and training to perform an assessment, prepare an investigation protocol, interpret the results and prepare a scope of work to remediate a "pollution condition" or "indoor environmental condition".

**Q.** **"Extended reporting period"** means the additional period of time in which to report a "claim" first made against the "insured" during or subsequent to the end of the "policy period".

**R.** **"Extra damages"** means punitive, exemplary or multiplied damages, and civil fines, penalties and assessments, but solely to the extent that the punitive, exemplary or multiplied damages, and civil fines, penalties and assessments:

   **1.** Are insurable under applicable law; and

   **2.** Arise out of a "pollution condition" or "indoor environmental condition" that results in "bodily injury", "property damage", "remediation costs" or "first-party remediation costs" to which this insurance otherwise applies.

**S.** **"Extra expense"** means costs incurred by the "insured" due to a "pollution condition" or "indoor environmental condition" that are necessary to avoid or mitigate any "business interruption". Such costs must be incurred to actually minimize the amount of foregone "business income" that would otherwise be covered pursuant to this Policy.

**T.** **"First named insured"** means the person or entity as identified in Item **1.** of the Declarations to this Policy. The "first named insured" is the party responsible for the payment of any premiums and the payment of, or evidencing payment of, any applicable "self-insured retention" amounts. The "first named insured" shall also serve as the sole agent on behalf of all "insureds" with respect to the provision and receipt of notices, including notice of cancellation or non-renewal, receipt and acceptance of any endorsements or any other changes to this Policy, return of any premium, assignment of any interest pursuant to this Policy, as well as the exercise of any applicable "extended reporting period", unless any such responsibilities are otherwise designated by endorsement.

CHUBB®

**Premises Pollution Liability Insurance Policy**

U. **"First-party claim"** means the first-party discovery of a "pollution condition" or an "indoor environmental condition" during the "policy period" by an "insured" to which this insurance applies.

V. **"First-party remediation costs"** means reasonable and necessary "remediation costs" incurred by an "insured" resulting from a "first-party claim". If no applicable laws exist that govern the remediation, investigation, quantification, monitoring, removal, disposal, treatment, neutralization, or immobilization of such "pollution condition" or "indoor environmental condition" in the jurisdiction of the "covered location", necessary "remediation costs" may be established by securing the written professional recommendations of an "environmental professional".

   **"First-party remediation costs"** also means reasonable and necessary expenses required to restore, repair or replace real or personal property to substantially the same condition it was in prior to being damaged during the course of responding to a "pollution condition" or "indoor environmental condition". Such expenses shall not include costs associated with betterments or improvements, except to the extent that such betterments or improvements are exclusively associated with the use of building materials which are environmentally superior to those materials which comprised the original damaged property. Any such environmentally superior material must be: **a)** certified as such by an applicable independent certifying institution, where such certification is available; or **b)** in the absence of any such certification, based solely on the judgment of the Insurer and at its sole discretion.

W. **"Fungi"** means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents, or byproducts produced or released by "fungi".

X. **"Government action"** means action taken or liability imposed by any Federal, state, commonwealth, municipal or other local government agency or body acting pursuant to the authority of "environmental law".

Y. **"Illicit abandonment"** means:

   **1.** Solely with respect to coverage for "covered locations", the intentional placement or abandonment of any solid, liquid, gaseous or thermal irritant, contaminant, or pollutant, including contaminated soil, contaminated silt, contaminated sedimentation, smoke, soot, vapors, fumes, acids, alkalis, chemicals, hazardous substances, hazardous materials, or waste materials, including "low-level radioactive waste", "mixed waste" and medical, red bag, infectious and pathological wastes, on, at or into a "covered location", by a person or entity that:

   **a.** Is not an "insured"; and

   **b.** Is not affiliated by common ownership with an "insured", and,

   **2.** Solely with respect to coverage for "transportation", the intentional placement or abandonment of any waste, goods, materials or product beyond the boundaries of a "covered location" during "transportation" by a person or entity that:

   **a.** Is not an "insured"; and

   **b.** Is not affiliated by common ownership with an "insured".

   **"Illicit abandonment"** does not mean any such placement or abandonment, above, which takes place, in whole or in part, prior to the inception date identified in Item **2.** of the Declarations of this Policy.

Z. **"Indoor environmental condition"** means:

   **1.** The presence of "fungi" in a building or structure, or the ambient air within such building or structure; or

   **2.** The discharge, dispersal, release, escape, migration or seepage of *legionella pneumophila* in a building or structure, or the ambient air within such building or structure,

   provided that such "fungi" or *legionella pneumophila* are not naturally occurring in the environment in the amounts and concentrations found within such building or structure.

CHUBB®

**Premises Pollution Liability Insurance Policy**

AA. **"Insured"** means the "first named insured", any "named insured", any "additional insured", and any past or present director or officer of, partner in, employee of, temporary or leased worker of, or, with respect to a limited liability company, a member of, any of the foregoing while acting within the scope of his or her duties as such.

BB. **"Key executive"** means the Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, President, General Counsel, general partner or managing partner (if the "insured" is a partnership), managing member (if the "insured" is a limited liability company) or sole proprietor (if the "insured" is a sole proprietorship) of the "insured". A "key executive" also means any other person holding a title designated by the "first named insured", approved by the Insurer, and identified by endorsement to this Policy.

CC. **"Legal defense expense"** means reasonable legal costs, charges, and expenses, including expert charges, incurred by the "insured":

1. In the investigation, adjustment or defense of "claims"; or,

2. Solely with respect to those instances where the "insured" has secured the prior consent of the Insurer, except in the event of a "first-party claim" that results in "emergency response costs", in order to clarify the extent of, minimize, and effect resolution of, any obligation to incur "first-party remediation costs".

DD. **"Loss"** means:

Coverage **A.**

1. A monetary judgment, award or settlement of compensatory damages arising from "bodily injury", "property damage" or "remediation costs", including associated "extra damages";

2. "Legal defense expense";

3. "First-party remediation costs";

4. "Emergency response costs";

5. "Business interruption loss"; and

6. "Catastrophe management costs".

Coverage **B.**

7. A monetary judgment, award or settlement of compensatory damages arising from "bodily injury", "property damage" or "remediation costs", including associated "extra damages";

8. "Legal defense expense";

9. "First-party remediation costs";

10. "Emergency response costs"; and

11. "Catastrophe management costs".

Coverage **C.**

12. A monetary judgment, award or settlement of compensatory damages arising from "bodily injury", "property damage" or "remediation costs", including associated "extra damages" and "legal defense expense"; and

13. "Catastrophe management costs".

Supplemental Coverages

Any other liability or first-party exposure insured pursuant to any Supplemental Coverage added by endorsement to this Policy.

EE. **"Low-level radioactive waste"** means waste that is radioactive but not classified as the following: high-level waste (spent nuclear fuel or the highly radioactive waste produced if spent fuel is reprocessed),

uranium milling residues, and waste with greater than specified quantities of elements heavier than uranium.

FF. **"Mediation"** means a conciliatory, non-binding attempt to resolve a "claim" using a neutral, third-party facilitator.

GG. **"Mixed waste"** means waste containing both radioactive and hazardous components as defined pursuant to United States law within the Atomic Energy Act and the Resource Conservation and Recovery Act, as either may be amended.

HH. **"Named insured"** means the "first named insured" and any other person or entity specifically endorsed onto this Policy as a "named insured", if any. "Named insureds" shall maintain the same rights pursuant to this Policy as the "first named insured", except for those rights specifically: **1)** reserved to the "first named insured" as defined herein; or **2)** limited by endorsement to this Policy.

II. **"Natural resource damage"** means  injury to, destruction of, or loss of, including the resulting loss of value of, fish, wildlife, biota, land, air, water, groundwater, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States of America (including the resources of the fishery conservation zone established by the Magnuson-Stevens Fishery Conservation and Management Act (16 U.S.C. § 1801 et. seq.)), any state, commonwealth or local government, or any Native American Tribe, or, if such resources are subject to a trust restriction on alienation, any members of any Native American Tribe, including the reasonable costs of assessing such injury, destruction or loss resulting therefrom.

JJ. **"Non-owned disposal site"** means:

1. Any treatment, storage, transfer, disposal or recycling site or facility located within the United States of America that has not at any time been owned or operated, in whole or in part, by any "insured", which receives, or has historically received, a "named insured's" waste for disposal; provided that such treatment, storage, transfer, disposal or recycling site or facility:

   a. Was properly permitted and licensed pursuant to "environmental law" to accept the "named insured's" waste at the time of such disposal by the Federal, state, commonwealth, municipal or other local government agencies or bodies with applicable jurisdiction;

   b. Was not owned or operated by any person, corporation or unincorporated association that was in bankruptcy at the time the "named insured's" waste was received for disposal; and

   c. Has not, prior to the time the "named insured's" waste was received for disposal, been identified on the United States EPA (CERCLA) National Priorities List or pursuant to any functional equivalent of that list made by Federal, state, commonwealth, municipal or other local government agency or body with applicable jurisdiction pursuant to "environmental law", or

2. Any treatment, storage, transfer, disposal or recycling site or facility specifically identified on a Schedule of Non-Owned Disposal Sites Endorsement attached to this Policy, if any.

KK. **"Policy period"** means:

1. The period of time specifically identified in Item **2.** of the Declarations to this Policy; or,

2. Solely with respect to "covered locations" added to this Policy during the period of time specifically identified in Item **2.** of the Declarations to the Policy, if any, the period of time following the effective date of such addition through the expiration date of the Policy identified in Item **2.** of the Declarations to this Policy; or

3. Any shorter period of time resulting from the cancellation of this Policy.

LL. **"Pollution condition"** means:

1. "Illicit abandonment"; or

2. The discharge, dispersal, release, escape, migration, or seepage of any solid, liquid, gaseous or thermal irritant, contaminant, or pollutant, including soil, silt, sedimentation, smoke, soot, vapors,

fumes, acids, alkalis, chemicals, electromagnetic fields (EMFs), hazardous substances, hazardous materials, waste materials, "low-level radioactive waste", "mixed waste" and medical, red bag, infectious or pathological wastes, on, in, into, or upon land and structures thereupon, the atmosphere, surface water, or groundwater.

MM."**Property damage**" means:

**1.** Physical injury to, or destruction of, tangible property of a third-party, including all resulting loss of use of that property;

**2.** Loss of use of tangible property of a third-party, that is not physically injured or destroyed;

**3.** Diminished value of tangible property owned by a third-party; or

**4.** "Natural resource damages".

"**Property damage**" does not mean "remediation costs".

NN."**Remediation costs**" means expenses incurred to investigate, quantify, monitor, remove, dispose, treat, neutralize, or immobilize "pollution conditions" or "indoor environmental conditions" to the extent required by "environmental law" in the jurisdiction of such "pollution conditions" or "indoor environmental conditions".

OO."**Rental income**" means the actual rental fees lost as a result of a "suspension" of a rented "covered location".

PP."**Responsible person**" means any employee of an "insured" responsible for environmental affairs, control, or compliance at a "covered location", or any "key executive" of, officer or director of, or partner in, an "insured".

QQ."**Self-insured retention**" means the largest applicable dollar amount among triggered coverage parts identified in Item **4.** of the Declarations to this Policy, or as otherwise designated by endorsement to this Policy, if any.

RR."**Suspension**" means that part of, or all of, a rented "covered location" is rendered untenantable for the purposes identified to the Insurer prior to the inception date of this Policy due to a "pollution condition" or "indoor environmental condition".

SS."**Terrorism**" means activities against persons, organizations or property of any nature:

**1.** That involve the following or preparation for the following:

    **a.** Use or threat of force or violence; or

    **b.** Commission or threat of a dangerous act; or

    **c.** Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

**2.** When one or both of the following applies:

    **a.** The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to  disrupt any segment of the economy; or

    **b.** It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology**.**

TT."**Transportation**" means the movement of an "insured's" waste, materials, goods or products to or from a "covered location" by automobile, aircraft, watercraft, railcar or other conveyance, including any associated loading or unloading thereof, by an "insured", or any third-party vendor engaged by an "insured" in the business of transporting property for hire, provided that any such movement, and associated loading and unloading activities, are performed beyond the boundaries of a "covered location".

UU."**Underground storage tank**" means any tank and associated piping and appurtenances connected thereto which tank has more than ten percent (10%) of its volume below ground.

CHUBB®

**Premises Pollution Liability
Insurance Policy**

**"Underground storage tank"** does not mean:

**1.** Any flow-through process tank, including, but not limited to, a septic tank, oil/water separator, sump, or any stormwater or wastewater collection/treatment vessel or system; or

**2.** Any tank that is located below ground, provided that such tank is located on or above the floor of a basement of a building or on or above the floor of any shaft or tunnel.

VV. **"War"** means war, whether or not declared, civil war, martial law, insurrection, revolution, invasion, bombardment or any use of military force, usurped power or confiscation, nationalization or damage of property by any government, military or other authority.

## VI. EXCLUSIONS

This insurance shall not apply to:

### A. Asbestos

"Loss" arising out of or related to asbestos or asbestos-containing materials.

This exclusion shall not apply to:

**1.** Monetary judgments, awards or settlements of compensatory damages resulting from "bodily injury" or "property damage", or any associated "extra damages" or "legal defense expenses";

**2.** Monetary judgments, awards or settlements of compensatory damages resulting from "remediation costs", or any associated "extra damages" or "legal defense expense", arising out of asbestos or asbestos-containing materials discovered in soil or groundwater; and

**3.** "First-party remediation costs", "emergency response costs", "catastrophe management costs" or "business interruption loss", or any associated "legal defense expense", resulting from "first-party claims" arising out of asbestos or asbestos-containing materials discovered in soil or groundwater.

### B. Contractual Liability

"Loss" arising out of or related to liability of others assumed by any "insured" through contract or agreement, except if the liability would have attached to the "insured" in the absence of such contract or agreement.

This exclusion shall not apply to "environmental indemnity obligations".

### C. Criminal Fines and Criminal Penalties

"Loss" arising out of or related to criminal fines, criminal penalties or criminal assessments.

### D. Divested Property

"Loss" arising out of or related to a "pollution condition" on, at, under or migrating from, or "indoor environmental condition" at, any "covered location":

**1.** That had been sold, abandoned, or given away by any "insured", or was condemned (collectively hereinafter Divested), prior to the "policy period"; or

**2.** When such "pollution condition" or "indoor environmental condition" first commenced after the "covered location" had been Divested.

This exclusion shall not apply to any "pollution conditions" or "indoor environmental conditions" that first commenced, in whole or in part, prior to the effective date that any such "covered location" was Divested as identified on the Divested Properties Coverage Endorsement attached to this Policy, if any.

### E. Employers Liability

"Claims" arising out of or related to "bodily injury" to:

**1.** Any "insured" or any employee of its parent corporation, subsidiary or affiliate:

**a.** Arising out of, or in the course of, employment by any "insured", its parent corporation, subsidiary or affiliate; or

CHUBB®

**Premises Pollution Liability
Insurance Policy**

    **b.** Performing duties related to the conduct of the business of any "insured", its parent corporation, subsidiary or affiliate.

**2.** The spouse, child, parent, brother or sister of any "insured" or employee of its parent corporation, subsidiary or affiliate as a consequence of Paragraph **1.,** above.

This exclusion applies:

**1.**   Whether any "insured" may be liable as an employer or in any other capacity; and

**2.** To any obligation to share damages with or repay someone else who must pay damages because of such "bodily injury".

**F. First-Party Property Damage**

"Loss" arising out of or related to damage to real or personal property owned by, leased to, loaned to, or rented by any "insured", or otherwise in the care, custody, or control of any "insured".

This exclusion shall not apply to "first-party remediation costs", "emergency response costs", "business interruption loss" and "catastrophe management costs".

**G. Fraud or Misrepresentation**

"Loss" arising out of or related to:

**1.** Fraudulent acts or material misrepresentations on the part of the "first named insured" made:

    **a.** Within an Application to this Policy; or

    **b.** During the Application or underwriting process prior to the inception date of this Policy,

    which would have affected the Insurer's decision to either issue this Policy, or issue this Policy and its endorsements pursuant to the financial terms identified in the Declarations to this Policy; or

**2.** Fraudulent acts or material misrepresentations on the part of any "responsible person" during the "policy period".

**H. Insured's Internal Expenses**

"Loss" arising out of or related to expenses incurred by any "insured" for services performed by its salaried staff and any employees.

This exclusion shall not apply to:

**1.** "Emergency response costs", along with any associated "catastrophe management costs" incurred during that same seven (7) day period; or

**2.** Any other costs, charges or expenses incurred with the prior approval of the Insurer at its sole discretion.

**I. Insured vs. Insured**

"Claims" made by any "insured" against any other "insured".

This exclusion shall not apply to:

**1.** "Claims" initiated by third-parties, including cross claims, counterclaims or claims for contribution by such parties against any "insured"; or

**2.** "Claims" that arise out of an indemnification provided by one "insured" to another "insured" in an "environmental indemnity obligation".

**J. Intentional Non-Compliance**

"Loss" arising out of or related to the intentional disregard of, or knowing, willful, or deliberate non-compliance with, any law, statute, regulation, administrative complaint, notice of violation, notice letter, instruction of any governmental agency or body, or any executive, judicial or administrative order, by, or at the direction of, any "responsible person".

CHUBB®

**Premises Pollution Liability
Insurance Policy**

## K. Known Conditions

"Loss" arising out of or related to "pollution conditions" or "indoor environmental conditions" in existence and reported to a "responsible person":

**1.** Prior to the "policy period"; or,

**2.** Solely with respect to "covered locations" added to this Policy during the period of time specifically identified in Item **2.** of the Declarations to the Policy, if any, prior to the effective date of coverage for such "covered location",

and not affirmatively disclosed to the Insurer in an Application or supplemental underwriting materials provided to the Insurer to secure coverage for such "covered location" pursuant to this Policy.

## L. Lead-Based Paint

"Loss" arising out of or related to lead-based paint.

This exclusion shall not apply to:

**1.** Monetary judgments, awards or settlements of compensatory damages resulting from "bodily injury" or "property damage", or any associated "extra damages" or "legal defense expenses";

**2.** Monetary judgments, awards or settlements of compensatory damages resulting from "remediation costs" , or any associated "extra damages" or "legal defense expenses", arising out of lead-based paint discovered in soil or groundwater; and

**3.** "First-party remediation costs", "emergency response costs", "catastrophe management costs" or "business interruption loss", or any associated "legal defense expense", resulting from "first-party claims" arising out of lead-based paint discovered in soil or groundwater.

## M. Material Change in Risk

"Loss" arising out of or related to a change in the use or operations at a "covered location" that materially increases the likelihood or severity of a "pollution condition", "indoor environmental condition", "claim" or "first-party claim" from the intended uses or operations identified:

**1.** By the "first named insured" for the Insurer in an Application or supplemental underwriting materials provided prior to the effective date of coverage for such "covered location", if any; or

**2.** Solely with respect to "covered locations" added to the Policy pursuant to an Automatic Acquisition and Due Diligence Endorsement attached to this Policy, if any, as part of the due diligence materials and supplemental underwriting materials provided to the Insurer as part of the notice required pursuant to that endorsement, if any.

This exclusion shall only apply to the "covered location" associated with the change in use or operations and shall not limit coverage for other "covered locations" to which this insurance applies.

## N. Non-Owned Disposal Sites

"Loss" arising out of or related to "pollution conditions" on, at, under or migrating from any treatment, storage, disposal, transfer or recycling site or facility that is not a "non-owned disposal site".

## O. Underground Storage Tanks

"Loss" arising out of or related to "pollution conditions" emanating from an "underground storage tank" located at a "covered location", when the existence of such "underground storage tank" was known to a "responsible person":

**1.** Prior to the "policy period"; or,

**2.** Solely with respect to "underground storage tanks" situated at "covered locations" added to this Policy during the "policy period", prior to the effective date of coverage for such "covered location".

This exclusion shall not apply to any "underground storage tank" that:

    **1.** Is identified on the Schedule of Underground Storage Tanks Endorsement or Schedule of Covered Storage Tanks (Financial Responsibility) Endorsement attached to this Policy, if any; or

    **2.** Has been removed or closed-in-place prior to the inception date of this Policy and such removal or closure was conducted in accordance with "environmental law".

**P.   Vehicle Damage**

"Claims" or associated "legal defense expense" for "property damage" to any automobile, aircraft, watercraft, railcar or other conveyance utilized for "transportation".

**Q.   War or Terrorism**

"Loss" arising out of or related to "pollution conditions" or "indoor environmental conditions" attributable, whether directly or indirectly, to any acts that involve, or that involve preparation for, "war" or "terrorism" regardless of any other cause or event that contributes concurrently or in any sequence to the injury or damage.

**R.   Workers' Compensation**

"Loss" arising out of or related to any obligation of any "insured" pursuant to the Jones Act or any workers' compensation, unemployment compensation, or disability benefits law or related laws.

## VII.  REPORTING AND COOPERATION

**A.** Without limiting the specific requirements contained in any Insuring Agreement or any other exposure-specific reporting requirements contained within this Policy, the "insured" shall also see to it that the Insurer receives notice of any "claim" or "first-party claim", as soon as practicable, by one or more of the following:

    **1.** Provide written notice to the address, fax number, or email address identified in Item **8.a.** of the Declarations to this Policy; or

    **2.** Provide verbal or electronic notice utilizing the **Environmental Incident Alert 24-hour Emergency Response and Incident Reporting System** by calling the telephone number identified in Item **8.** of the Declarations to this Policy or by using the associated telephone web application, respectively.

Such notice should include reasonably detailed information as to:

    **1.** The identity of the "insured", including contact information for an appropriate person to contact regarding the handling of the "claim" or "first-party claim";

    **2.** The identity of the "covered location";

    **3.** The nature of the "claim" or "first-party claim"; and

    **4.** Any steps undertaken by the "insured" to respond to the "claim" or "first-party claim".

**B.** The "insured" must:

    **1.** As soon as practicable, send the Insurer copies of any demands, notices, summonses or legal papers received in connection with any "claim";

    **2.** Authorize the Insurer to obtain records and other information;

    **3.** Cooperate with the Insurer in the investigation, settlement or defense of the "claim";

    **4.** Assist the Insurer, upon the Insurer's request, in the enforcement of any right against any person or organization which may be liable to the "insured" because of "loss" to which this Policy may apply; and

    **5.** Provide the Insurer with such information and cooperation as it may reasonably require.

**C.** No "insured" shall make or authorize an admission of liability or attempt to settle or otherwise dispose of any "claim", without the written consent of the Insurer.  Nor shall any "insured" retain any consultants or

"catastrophe management firms", or incur any "first-party remediation costs" or "catastrophe management costs" with respect to a "first-party claim", without the prior consent of the Insurer, except for "emergency response costs".

**D.**  Upon the discovery of a "pollution condition" or "indoor environmental condition", the "insured" shall make every attempt to mitigate any loss and comply with applicable "environmental law".  The Insurer shall have the right, but not the duty, to mitigate such "pollution conditions" or "indoor environmental condition" if, in the sole judgment of the Insurer, the "insured" fails to take reasonable steps to do so.  In that event, any "remediation costs" or "catastrophe management costs" incurred by the Insurer shall be deemed incurred by the "insured", and shall be subject to the "self-insured retention" and Limits of Liability identified in the Declarations to this Policy.

For the purposes of fulfilling the notice requirements contained in the Insuring Agreements to this Policy, notice supplied pursuant to one or more of the verbal or electronic notice mechanisms specifically contemplated in Subsection **A.**, above, or on the Declarations, shall constitute written notice to the Insurer.

## VIII. EXTENDED REPORTING PERIOD

**A.**  Provided the "first named insured" has not purchased any other insurance to replace this Policy, the "first named insured" shall be entitled to a basic "extended reporting period", and may purchase an optional supplemental "extended reporting period", following Cancellation, as described in Subsection **A.**, Paragraph **1.** of Section **IX., GENERAL CONDITIONS**, or nonrenewal of this Policy, in accordance with the terms and conditions described in Subsections **B.** through **D.**, below.

**B.**  "Extended reporting periods" shall not reinstate or increase any of the Limits of Liability.  "Extended reporting periods" shall not extend the "policy period" or change the scope of coverage provided.  A "claim" first made against an "insured" and reported to the Insurer within the basic "extended reporting period" or supplemental "extended reporting period", whichever is applicable, shall be deemed to have been made and reported on the last day of the "policy period".  In addition, if an "insured" first discovers a "pollution condition" or "indoor environmental condition" during the "policy period" and reports such "first-party claim" to the Insurer within the basic "extended reporting period" or supplemental "extended reporting period", whichever is applicable, then such "first-party claim" shall also be deemed to have been first discovered and reported on the last day of the "policy period".

**C.**  The "first named insured" shall have a ninety (90) day basic "extended reporting period" without additional charge.

**D.**  The "first named insured" shall also be entitled to purchase a supplemental "extended reporting period" of up to thirty-three (33) months for not more than two hundred percent (200%) of the full premium identified in Item **6.** of the Declarations to this Policy, and any additional premiums resulting from coverage added during the "policy period". Such supplemental "extended reporting period" starts when the basic "extended reporting period" ends. The Insurer shall issue an endorsement providing a supplemental "extended reporting period" provided that the "first named insured":

    **1.**  Makes a written request, to the address identified in **8.b.** of the Declarations to this Policy, for such endorsement which the Insurer receives prior to the expiration of the "policy period"; and

    **2.**  Pays the additional premium when due.  If that additional premium is paid when due, the supplemental "extended reporting period" may not be cancelled, provided that all other terms and conditions of the Policy are met.

## IX. GENERAL CONDITIONS

### A.  Cancellation

    **1.**  This Policy may be cancelled only by the "first named insured", or through the "first named insured's" agent, by mailing to the Insurer at the address identified in Item **8.b.** of the Declarations to this Policy, written notice stating when such cancellation shall be effective.

    **2.**  This Policy may be cancelled by the Insurer for the following reasons:

        **a.**  Non-payment of premium; or

CHUBB®

**Premises Pollution Liability**
**Insurance Policy**

    **b.**  Fraud or material misrepresentation on the part of any "insured",

by mailing to the "first named insured" at the "first named insured's" last known address, written notice stating when, not less than sixty (60) days thereafter, fifteen (15) days if cancellation is for non-payment of any unpaid portion of the premium, such cancellation shall be effective. The mailing of notice shall be sufficient proof of notice. The effective date and hour of cancellation stated in the notice shall be the end of the "policy period".

Subparagraph **2.b.**, herein, shall apply only to that "insured" that engages in the fraud or misrepresentation. This exception shall not apply to any "insured" that is a parent corporation, subsidiary, employer of, or otherwise affiliated by ownership with, such "insured".

    **3.**  In the event of cancellation, the premium percentage identified in Item **6.** of the Declarations to this Policy shall be the minimum-earned premium upon the inception date of this Policy. Thereafter, the remaining unearned premium, if any, shall be deemed earned by the Insurer on a *pro rata* basis over the remainder of the "policy period". Any unearned premium amounts due the "first named insured" upon cancellation of this Policy shall be calculated on a *pro rata* basis and refunded within thirty (30) days of the effective date of cancellation.

## B. Inspection and Audit

To the extent of the "insured's" ability to provide such access, and with reasonable notice to the "insured", the Insurer shall be permitted, but not obligated, to inspect and sample the "covered locations". The "insured" shall have the concurrent right to collect split samples. Neither the Insurer's right to make inspections, the making of said inspections, nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of the "insured" or others, to determine or warrant that such property or operations are safe or in compliance with "environmental law", or any other law.

The Insurer may examine and audit the "insured's" books and records during this "policy period" and extensions thereof and within three (3) years after the final termination of this Policy.

## C. Legal Action Against the Insurer

No person or organization other than an "insured" has a right pursuant to this Policy:

    **1.**  To join the Insurer as a party or otherwise bring the Insurer into a suit against any "insured"; or

    **2.**  To sue the Insurer in connection with this insurance unless all of the Policy terms have been fully complied with.

A person or organization may sue the Insurer to recover after an agreed settlement or on a final judgment against an "insured". However, the Insurer shall not be liable for amounts that are not payable pursuant to the terms of this Policy or that are in excess of the applicable Limit of Liability. An agreed settlement means a settlement and release of liability signed by the Insurer, the "insured", and the claimant or the claimant's legal representative.

## D. Bankruptcy

The insolvency or bankruptcy of any "insured", or any "insured's" estate, shall not relieve the Insurer of its obligations pursuant to this Policy. However, any such insolvency or bankruptcy of the "insured", or the "insured's" estate, shall not relieve the "insured" of its "self-insured retention" or deductible period obligations pursuant to this Policy. This insurance shall not replace any other insurance to which this Policy is excess, nor shall this Policy drop down to be primary, in the event of the insolvency or bankruptcy of any underlying insurer.

## E. Subrogation

In the event of any payment pursuant to this Policy by the Insurer, the Insurer shall be subrogated to all of the rights of recovery against any person or organization, and the "insured" shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. All "insureds" shall do nothing to prejudice such rights. Any recovery as a result of subrogation proceedings arising pursuant to this Policy shall accrue first to the "insureds" to the extent of any payments in excess of the limit of coverage; then to the Insurer to the extent of its payment pursuant to the Policy; and then to the "insured"

**CHUBB**®

**Premises Pollution Liability
Insurance Policy**

to the extent of the "self-insured retention".  Expenses incurred in such subrogation proceedings shall be apportioned among the interested parties in the recovery in the proportion that each interested party's share in the recovery bears to the total recovery.

**F.   Representations**

By accepting this Policy, the "first named insured" agrees that:

**1.**   The statements in the Declarations, schedules and endorsements to, and Application for, this Policy are accurate and complete;

**2.**   Those statements and representations constitute warranties that the "first named insured" made to the Insurer; and

**3.**   This Policy has been issued in reliance upon the "first named insured's" warranties.

**G.   Separation of Insureds**

Except with respect to the Limits of Liability, Cancellation condition **2.a.**, and any applicable exclusions, this Policy applies:

**1.**   As if each "named insured" were the only "insured"; and

**2.**   Separately to each "named insured" against whom a "claim" is made,

and any fraud, misrepresentation, breach of a condition or violation of any duty (hereinafter Breach) by an "insured" shall not prejudice coverage for any "named insured" pursuant to this Policy, provided that: **1)** such "named insured' did not participate in, know of or assist in such Breach; and **2)** such "named insured" is not a parent, subsidiary, partner, member, director, officer of, employer of or otherwise affiliated with, the "insured" that committed such Breach.

**H.   Other Insurance**

If other valid and collectible insurance is available to any "insured" covering "loss" also covered by this Policy, other than a policy that is specifically written to apply in excess of this Policy, the insurance afforded by this Policy shall apply in excess of and shall not contribute with such other insurance.

**I.   Changes and Assignment**

Notice to or knowledge possessed by any person shall not effect waiver or change in any part of this Policy or estop the Insurer from asserting any right pursuant to the terms of this Policy. The terms, definitions, conditions, exclusions and limitations of this Policy shall not be waived or changed, and no assignment of any interest in this Policy shall bind the Insurer, except as provided by endorsement and attached to this Policy.

**J.   Headings**

The descriptions in the headings and sub-headings of this Policy are inserted solely for convenience and do not constitute any part of the terms or conditions hereof.

**K.   Consent**

Where the consent of the Insurer, or an "insured", is required pursuant to this Policy, such consent shall not be unreasonably withheld, delayed, conditioned, or denied.

## NAMED INSUREDS (BROAD – CONTROLLED CHAIN) ENDORSEMENT

| Named Insured<br>Vision Service Plan (VSP) | | | Endorsement Number<br>001 |
|---|---|---|---|
| Policy Symbol<br>PPL | Policy Number<br>G71469268 002 | Policy Period<br>12/10/2019  to  12/10/2020 | Effective Date of Endorsement<br>12/10/2019 |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

The persons or entities within the scope of the description contained in the Schedule of Named Insureds, below, are "named insureds" pursuant to this Policy.

#### Schedule of Named Insureds

1. All corporations, limited partnerships, limited liability partnerships, limited liability companies or other business entities or associations (other than joint ventures and general partnerships), as now or may hereafter exist during the "policy period", in which the "first named insured", itself, or through a direct controlled chain of such underlying business entities or associations, has management control, regardless of whether that control arises by way of: **a)** a simple majority ownership interest in such underlying entity(ies) or association(s); or **b)** any other position in the ownership structure of such entity(ies) or association(s) whereby such "named insured" exerts management control over the entity(ies) or association(s) through: **i)** its holding a majority of the applicable voting interests that effectively control the management of such entity(ies) or association(s); **ii)** its legal status (e.g., a managing member of a limited liability company or general partner in a limited partnership etc.) with respect to such entity(ies) or associations(s); or **iii)** its contractual rights in a written contract governing the formation of, or respective rights between the various equity stakeholders in,  such entity(ies) or association(s) (hereinafter Controlled Affiliates); and

2. All joint ventures or general partnerships, as now or may hereafter exist during the "policy period", to which the "first named insured", itself, or one of its Controlled Affiliates, is a party and controls the operations of any such joint venture or general partnership, but solely to the extent of the "first named insured's" or Controlled Affiliates' legal responsibility for the liabilities of such joint venture or general partnership.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

## SCHEDULE OF ADDITIONAL INSUREDS (BROAD) ENDORSEMENT

| Named Insured<br>Vision Service Plan (VSP) | | | Endorsement Number<br>002 |
|---|---|---|---|
| Policy Symbol<br>PPL | Policy Number<br>G71469268 002 | Policy Period<br>12/10/2019  to  12/10/2020 | Effective Date of Endorsement<br>12/10/2019 |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

The persons or entities within the scope of the description contained in the Schedule of Additional Insureds, below, are "additional insureds" pursuant to this Policy, but solely with respect to their vicarious liability arising out of any "named insured's" direct liability for a "pollution condition" on, at, under or migrating from, or an "indoor environmental condition" at, a "covered location" to which this insurance applies.

#### Schedule of Additional Insureds

1.  All corporations, limited partnerships, limited liability partnerships, limited liability companies or other business entities or associations, other than joint ventures and general partnerships, as now or may hereinafter exist during the "policy period", in which a "named insured" maintains an ownership interest; and

2.  All joint ventures or general partnerships, as now or may hereafter exist during the "policy period", to which a "named insured" is a party, but solely to the extent of the "named insured's" legal responsibility for the vicarious liability of such joint venture or general partnership.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

PF-44891 (09/14)                                                                 Page 1 of 1

## SCHEDULE OF NAMED INSUREDS ENDORSEMENT

| Named Insured<br>Vision Service Plan (VSP) | | | Endorsement Number<br>003 |
|---|---|---|---|
| Policy Symbol<br>PPL | Policy Number<br>G71469268 002 | Policy Period<br>12/10/2019  to  12/10/2020 | Effective Date of Endorsement<br>12/10/2019 |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

The persons or entities identified in the Schedule of Named Insureds, below, are "named insureds" pursuant to this Policy.

### Schedule of Named Insureds

1. Allure Eyewear, LLC
2. Altair Eyewear, Inc. (CA)
3. Delta Add-Power Systems, Inc. (merged into Officemate Software Solutions, Inc. effective 9/11/09)
4. Eastern Vision Service Plan IPA, Inc. (NY)
5. Eastern Vision Service Plan, Inc. (NY)
6. Eye Designs, LLC
7. Eyeconic, Inc. (DE)
8. Eyefinity 401k Profit Sharing Plan
9. Eyefinity, Inc. (DE)
10. EyeNetra, Inc.
11. Marchon Eyewear, Inc.
12. MEI 3D, LLC
13. New Hampshire Vision Service Corporation
14. Officemate Software Solutions, Inc. (DE)
15. Optical Opportunities, LLC
16. OSS Holdings, Inc.
17. Plexus Optix, Inc. (DE)
18. RLISYS Software Solutions, Inc. (merged into Officemate Software Solutions, Inc. effective 9/11/09)
19. Southwest Vision Service Plan, Inc. (TX)
20. Vision Service Plan – Post Retirement Welfare Benefits Program – VEBA Trust
21. Vision Service Plan (CA)
22. Vision Service Plan (HI)
23. Vision Service Plan (OH)
24. Vision Service Plan Executive Deferred Compensation Plan (457 Defined

Retirement Plan)

25. Vision Service Plan Executive Deferred Compensation Plan Rabbi Trust (Non-Qualified Plan)

26. Vision Service Plan Insurance Company (MO)

27. Vision Service Plan Insurance Company (OH)

28. Vision Service Plan of Illinois, NFP

29. Vision Service Plan of Wyoming

30. Vision Service Plan, Inc. (NV)

31. VSP Ceres, Inc. (DE)

32. VSP Global, Inc. (DE)

33. VSP Holding Company, Inc. (DE)

34. VSP Labs, Inc. (DE)

35. VSP Optical Group, Inc. (DE)

36. VSP Prudential 401k Retirement Plan

37. VSP Retail Development Holding, Inc.

38. VSP Retail, Inc.

39. VSP Retirement Plan

40. VSP Vision Care, Inc.

41. MVO Licensing, LLC

42. VSP Ventures, LLC

43. VSP Vision Care, Inc. (VA)

44. VSP Ventures Management Services LLC

45. VSP Ventures Optometric Solutions LLC

46. Rosin of Tennessee Management Company, LLC

47. Eyeconic.com

48. McAllister.com

49. Visionworks, Inc. (DE)

50. Eye DRx Retail Management, Inc. (DE)

51. ECCA Managed Vision Care, Inc. (TX)

52. Visionary Properties, Inc. (DE)

53. Charles M. Cummins, O.D., P.A.

54. Visionworks of America, Inc. (TX)

55. Visionary Retail Management, LLC

56. Visionworks Enterprises, Inc. (DE)

57. Visionworks Lab Services, Inc. (TX)

58. Visionworks Distribution Services, Ltd. (TX)

59. Empire Vision Centers, Inc.(NY)

60. Mark Lynn, O.D. and Associates, P.C.

61. Tom Sowash OD & Associates PC

62. Jason Wonch, O.D. and Associates, A P.C.

63. Pacific Eye Group, P.C.

**64.** Daniel Poth, O.D. and Associates, P.C

**65.** Dr. Mark Lynn & Associates, PLLC

**66.** Sowash Optometry Group, P.C.

**67.** Rhode Island Optometrics, LLC

**68.** Optometric Providers of New Hampshire

**69.** Optometric Providers of Rhode Island

**70.** Massachusetts Optometric Associates, Inc.

**71.** Independent Eye Care MSO, Inc.

**72.** Community Eye Care, LLC

**73.** Community Eye Care of South Carolina, LLC

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

## AGGREGATED SELF-INSURED RETENTION ENDORSEMENT

| Named Insured<br>Vision Service Plan (VSP) | | | Endorsement Number<br>004 |
|---|---|---|---|
| Policy Symbol<br>PPL | Policy Number<br>G71469268 002 | Policy Period<br>12/10/2019  to  12/10/2020 | Effective Date of Endorsement<br>12/10/2019 |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**I.** Item **4.a.**, **Self-Insured Retention**, of the Declarations is hereby deleted in its entirety and replaced with the following:

    **i.** **$** 50,000 Per Pollution Condition or Indoor Environmental Condition retention

    **ii.** **$** 150,000 Aggregate retention applicable to all Pollution Conditions or Indoor Environmental Conditions (as applicable)

    **iii.** **$** 25,000 Maintenance retention Per Pollution Condition or Indoor Environmental Condition, thereafter.

**II.** Section **II.**, **LIMITS OF LIABILITY AND SELF-INSURED RETENTION**, Subsection **B.**, of this Policy is hereby deleted in its entirety and replaced with the following:

    **B.** One "self-insured retention" shall apply to all "loss" (exclusive of "business interruption loss") arising from the same, continuous, repeated, or related "pollution condition" or "indoor environmental condition". If the same, continuous, repeated, or related "pollution condition" or "indoor environmental condition" triggers coverage pursuant to multiple coverage parts, or otherwise involves multiple exposures that have been assigned exposure-specific "self-insured retention" amounts by endorsement to this Policy, the single largest of the associated "self-insured retention" amounts identified in: **1)** Item **4.** of the Declarations; **2)** any Supplemental Coverage added by endorsement to this Policy; or **3)** any exposure-specific "self-insured retention" endorsement added to this Policy, shall apply to all "loss" and other covered exposures arising out of such "pollution condition" or "indoor environmental condition", except for any "catastrophe management costs" that are assigned an exposure-specific "self-insured retention" by endorsement to this Policy, if any (hereinafter Catastrophe Management-Specific SIR). Amounts within any such Catastrophe Management-Specific SIR shall be independent of, and shall not otherwise erode, the single largest "self-insured retention" applicable to all other covered exposures arising out of the same "pollution condition" or "indoor environmental condition" as contemplated herein, or any Maintenance "self-insured retention" discussed below. However, such amounts shall be credited against the Aggregate "self-insured retention' discussed below.

    Upon exhaustion of the Aggregate "self-Insured retention" amount identified in Item **4.a.ii** of the Declarations, by approved payments made pursuant to multiple "self-insured retentions" applicable to multiple "pollution conditions" or "indoor environmental conditions" to which this insurance applies, including payments for "catastrophe management costs" subject to a Catastrophe Management-Specific SIR, if any, all ongoing and future "loss" attributable to both outstanding and newly discovered "pollution conditions" or "indoor environmental conditions", if any, shall be subject to the reduced Maintenance "self-insured retention" amount identified in Item **4.a.iii.** of the Declarations. With respect to any ongoing "loss" attributable to an outstanding "pollution condition" or "indoor environmental condition" that has been reported to the Insurer prior to exhaustion of the Aggregate "self-insured retention", if approved payments for "loss" in an

amount equal to or in excess of the Maintenance "self-insured retention", then the "named insureds" shall have no further "self-insured retention" obligation with respect to that specific "pollution condition" or "indoor environmental condition".  Notwithstanding any other provision in this Policy to the contrary, under no circumstances shall the Insurer be liable to pay any amount pursuant to this Policy until the "named insureds" have paid the full amount of the "self-insured retention", or, in the event of exhaustion, discussed above, the Maintenance "self-insured retention", with respect to each "pollution condition" or "indoor environmental condition.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

## ASBESTOS AND/OR LEAD-BASED PAINT COVERAGE (INADVERTENT DISTURBANCE) ENDORSEMENT

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| Vision Service Plan (VSP) | | | 005 |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| PPL | G71469268 002 | 12/10/2019  to  12/10/2020 | 12/10/2019 |

| Issued By (Name of Insurance Company) |
|---|
| Illinois Union Insurance Company |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

Solely to the extent that there is an **X** indicated in either Section **I.** or Section **II.** of this Endorsement, below, the "insured" and the Insurer hereby agree to the following corresponding changes to this Policy:

**I.** ☒ Section **VI., EXCLUSIONS,** Subsection **A., Asbestos,** of this Policy is hereby deleted in its entirety and replaced with the following:

**A. Asbestos**

"Loss" arising out of or related to asbestos or asbestos-containing materials.

This exclusion shall not apply to:

**1.** Monetary judgments, awards or settlements of compensatory damages resulting from "bodily injury" or "property damage", or any associated "extra damages" or "legal defense expenses";

**2.** Monetary judgments, awards or settlements of compensatory damages resulting from "remediation costs", or any associated "extra damages" or "legal defense expense", arising out of asbestos or asbestos-containing materials discovered in soil or groundwater;

**3.** "First-party remediation costs", "emergency response costs", "catastrophe management costs" or "business interruption loss", or any associated "legal defense expense", resulting from "first-party claims" arising out of asbestos or asbestos-containing materials discovered in soil or groundwater; and

**4.** "First-party remediation costs" and "emergency response costs", arising out of asbestos or asbestos-containing material, provided such "remediation costs" are the result of a "pollution condition" that:

**a.** First commence, in their entirety, during the "policy period" or within <u>six</u> (6) calendar days preceding the "policy period";

**b.** Do not arise out of or relate to any "pollution conditions" which existed, in whole or in part, prior to 12/03/2019 ;

**c.** Are unintended and unexpected from the standpoint of the "insured";

**d.** Are sudden, direct, and immediate;

**e.** Are first discovered by the "insured" within <u>seven</u> (7) calendar days of commencement and during the "policy period"; and

**f.** Are reported to the Insurer within <u>twenty-one</u> (21) calendar days following the discovery of such "pollution conditions" by the "insured".

<u>Notwithstanding any reporting obligations contained in Section **I., INSURING AGREEMENTS**, or Section **VII., REPORTING AND COOPERATION**, of this Policy, generally, it is a condition precedent to coverage pursuant to this Exception **4.** that the "insured" also provide conclusive documentation of strict compliance with requirements **a.** through **f.**,</u>

<u>above, regardless of whether the Insurer was prejudiced by the failure to meet these requirements.</u>

Notwithstanding anything stated in this Exception **4.**, above, coverage is not afforded pursuant to this Policy for any "first-party remediation costs" arising out of or related to asbestos or asbestos-containing material abatement, removal, or disposal, resulting from, in whole or in part, the maintenance, renovation, or physical improvement of a "covered location" where asbestos or asbestos-containing material was known to be present by a "responsible person".

II. [X] Section **VI.**, **EXCLUSIONS**, Subsection **L.**, **Lead-Based Paint**, of this Policy is hereby deleted in its entirety and replaced with the following:

### L. Lead-Based Paint

"Loss" arising out of or related to lead-based paint.

This exclusion shall not apply to:

**1.** Monetary judgments, awards or settlements of compensatory damages resulting from "bodily injury" or "property damage", or any associated "extra damages" or "legal defense

**2.** Monetary judgments, awards or settlements of compensatory damages resulting from "remediation costs", or any associated "extra damages" or "legal defense expense", arising out of lead-based paint materials discovered in soil or groundwater;

**3.** "First-party remediation costs", "emergency response costs", "catastrophe management costs" or "business interruption loss", or any associated "legal defense expense", resulting from "first-party claims" arising out of lead-based paint discovered in soil or groundwater; and

**4.** "First-party remediation costs" and "emergency response costs", arising out of lead-based paint, provided such "remediation costs" are the result of a "pollution condition" that:

   **a.** First commence, in their entirety, during the "policy period" or within <u>six</u> (6) calendar days preceding the "policy period";

   **b.** Do not arise out of or relate to any "pollution conditions" which existed, in whole or in part, prior to 12/03/2019 ;

   **c.** Are unintended and unexpected from the standpoint of the "insured";

   **d.** Are sudden, direct, and immediate;

   **e.** Are first discovered by the "insured" within <u>seven</u> (7) calendar days of commencement and during the "policy period"; and

   **f.** Are reported to the Insurer within <u>twenty-one</u> (21) calendar days following the discovery of such "pollution conditions" by the "insured".

   <u>Notwithstanding any reporting obligations contained in Section</u> **I., INSURING AGREEMENTS**, <u>or Section</u> **VII., REPORTING AND COOPERATION**, <u>of this Policy, generally, it is a condition precedent to coverage pursuant to this Exception</u> **4.** <u>that the "insured" also provide conclusive documentation of strict compliance with requirements</u> **a.** <u>through</u> **f.**, <u>above, regardless of whether the Insurer was prejudiced by the failure to meet these requirements.</u>

Notwithstanding anything stated in this Exception **4.**, above, coverage is not afforded pursuant to this Policy for any "first-party remediation costs" arising out of or related to lead-based paint abatement, removal, or disposal, resulting from, in whole or in part, the maintenance, renovation, or physical improvement of a "covered location" where lead-based paint was known to be present by a "responsible person".

**III.** Sublimits of Liability ( X̄ Not applicable if **X** indicated herein)

      **Per Asbestos/Lead Condition Sublimit of Liability: $**

      **Aggregate Asbestos/Lead Conditions Sublimit of Liability:  $**

      The amount that the Insurer shall pay pursuant to this Policy for the coverage afforded pursuant to Exception **4.**, of each exclusion above (as applicable) is subject to the Per Asbestos/Lead Condition Sublimit of Liability and Aggregate Asbestos/Lead Conditions Sublimit of Liability identified above.  These Sublimits of Liability shall be subject to, and payments made within these Sublimits of Liability shall erode, the Limits of Liability identified in Item **3.** of the Declarations to this Policy, along with any other applicable exposure-specific Limits or Sublimits of Liability added by endorsement hereto.  Under no circumstance shall the Insurer be liable to pay any amount in excess of any applicable Limit or Sublimit of Liability.

All other terms and conditions of this Policy remain unchanged.

                                              _____
                                                   Authorized Representative

## DEDICATED DEFENSE AGGREGATE LIMIT ENDORSEMENT

| Named Insured Vision Service Plan (VSP) | | | Endorsement Number 006 |
|---|---|---|---|
| Policy Symbol PPL | Policy Number G71469268 002 | Policy Period 12/10/2019  to  12/10/2020 | Effective Date of Endorsement 12/10/2019 |
| Issued By (Name of Insurance Company) Illinois Union Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

I.   Dedicated Defense Aggregate Limit of Liability

   $ 1,000,000  shall be the Dedicated Defense Aggregate Limit of Liability applicable to "legal defense expense" covered pursuant to this Policy. Therefore, subject to the exhaustion and further indemnity limit erosion scenario contemplated in Sections **II.** and **III.** of this Endorsement, this Dedicated Defense Aggregate Limit of Liability shall be the maximum amount the Insurer shall pay for all "legal defense expense" arising out of "claims" to which this insurance applies.

II.   Section **III.**, **DEFENSE AND SETTLEMENT**, Subsection **D.**, of this Policy is hereby deleted in its entirety and replaced with the following:

   **D.**   "Legal defense expenses" reduce the Dedicated Defense Aggregate Limit of Liability identified in the Dedicated Defense Aggregate Limit Endorsement and, with respect to additional "legal defense expense" incurred following exhaustion thereof, if any, the Limits of Liability identified in Item **3.** of the Declarations of this Policy, along with any applicable Limits or Sublimits of Liability identified in any endorsement hereto.  "Legal defense expense" shall also be applied to the "self-insured retention".

III.   Section **III.**, **DEFENSE AND SETTLEMENT**, of this Policy is hereby amended by addition of the following:

   **F.**   In the event that the Dedicated Defense Aggregate Limit of Liability identified in the Dedicated Defense Aggregate Limit Endorsement is exhausted, the Insurer shall retain the right and, subject to Subsections **A.** and **E.**, above, the duty to defend the insured" against all ongoing and future "claims" to which this insurance applies.  Following such exhaustion event, any "legal defense expense" incurred by the Insurer shall reduce the Limits of Liability identified in Item **3.** of the Declarations to this Policy, along with any applicable Limits or Sublimits of Liability identified in any endorsement hereto.

All other terms and conditions of this Policy remain unchanged.

_____
                                  Authorized Representative

## EVACUATION EXPENSE COVERAGE ENDORSEMENT

| Named Insured<br>Vision Service Plan (VSP) | | | Endorsement Number<br>007 |
|---|---|---|---|
| Policy Symbol<br>PPL | Policy Number<br>G71469268 002 | Policy Period<br>12/10/2019  to  12/10/2020 | Effective Date of Endorsement<br>12/10/2019 |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**I.**  Section **V., DEFINITIONS**, Subsection **F.** of this Policy is hereby deleted in its entirety and replaced with the following:

**F.**  **"Business interruption loss"** means:

**1.**  "Business income";

**2.**  "Extra expense";

**3.**  "Delay expense"; and

**4.**  "Evacuation expense".

**II.**  Section **V., DEFINITIONS**, of this Policy is hereby amended by addition of the following:

"**Evacuation expense**" means reasonable expenses incurred by an "insured" within **thirty (30)** days of a "key executive's" discovery of "pollution condition" or "indoor environmental condition" that results in a "business interruption" to which this insurance applies, provided that such expenses are incurred in order to:

**1.**  Remove tenants, occupants or guests from a "covered location"; and

**2.**  Transport and lodge such tenants, occupants or guests at another location,

and such removal, transport and lodging is, in the good faith opinion of the "key executive", necessary due to his or her reasonable belief that such "pollution condition" or "indoor environmental condition" creates an unsafe environment for such tenants, occupants or guests.

All other terms and conditions of this Policy remain unchanged.

_____

Authorized Representative

# FIRST-PARTY PROPERTY VALUE DIMINUTION COVERAGE ENDORSEMENT

| Named Insured Vision Service Plan (VSP) | | | Endorsement Number 008 |
|---|---|---|---|
| Policy Symbol **PPL** | Policy Number **G71469268 002** | Policy Period **12/10/2019  to  12/10/2020** | Effective Date of Endorsement **12/10/2019** |
| Issued By (Name of Insurance Company) **Illinois Union Insurance Company** | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

**I.** Section **I., INSURING AGREEMENTS**, of this Policy is hereby amended by addition of the following:

SUPPLEMENTAL COVERAGE – FIRST-PARTY DIMINUTION IN VALUE

"First-party claims" arising out of: **1)** a "pollution condition" on, at, under or migrating from; or **2)** an "indoor environmental condition" at, a "covered location, provided the "insured" first discovers such "pollution condition" or "indoor environmental condition" during the "policy period". Any such "first-party claim" must be reported to the Insurer, in writing, during the "policy period" or within thirty (30) days after the expiration of the "policy period".

The coverage afforded pursuant to this Supplemental Coverage only applies to "pollution conditions" or "indoor environmental conditions" that first commence, in their entirety, on or after the Retroactive Date identified below and prior to the expiration of the "policy period".

Retroactive Date: 11/19/2018

**II.** Solely with respect to the coverage afforded pursuant to this Supplemental Coverage, the following additional provisions apply:

### Limits of Liability and Self-Insured Retention

**Per Diminution Condition Sublimit of Liability: $** N/A

**Aggregate Diminution Conditions Sublimit of Liability: $** N/A

The amount that the Insurer shall pay pursuant to this Policy for "loss" for coverage afforded pursuant to this Endorsement shall be subject to the Per Diminution Condition Sublimit of Liability and Aggregate Diminution Conditions Sublimit of Liability identified above. Therefore, the Per Diminution Condition Sublimit of Liability, above, shall be the maximum amount the Insurer shall pay for all "loss" arising out of or related to the same, continuous, repeated, or related "pollution condition" or "indoor environmental condition" to which this insurance applies. Moreover, the Aggregate Diminution Conditions Sublimit of Liability, above, shall be the maximum amount the Insurer shall pay for all "loss" arising out of or related to all "pollution conditions" and "indoor environmental conditions" to which this insurance applies. These Sublimits of Liability are subject to, and payments made within these Sublimits of Liability shall erode, the Limits of Liability identified in Item **3.** of the Declarations to this Policy, along with any other applicable exposure-specific Limits or Sublimits of Liability added by endorsement hereto. Under no circumstance shall the Insurer be liable to pay any amount in excess of any applicable Limit or Sublimit of Liability.

**Per Diminution Condition Self-insured Retention: $** N/A

Notwithstanding anything identified in Item **4.** of the Declarations to this Policy that might be construed to the contrary, the Per Diminution Condition Self-Insured Retention, above, shall be the "self-insured

retention" applicable to any coverage provided pursuant to this Policy for each "pollution condition" or "indoor environmental condition" resulting in "diminution in value" to which this insurance applies.

**III.** Section **V.,  DEFINITIONS**, of this Policy is hereby amended by addition of the following:

**"Diminution in value"** means the decrease in fair market value of a "covered location" arising out of a "pollution condition" on at or under, or an "indoor environmental condition" at, such "covered location", which results in "first-party remediation costs" to which this Policy more generally applies.  Such decrease shall be measured by either:

**1.** An amount developed in a final adjudication by a tax court of competent jurisdiction; or

**2.** By generally accepted property appraisal methods, including, but not limited to mortgage-equity analysis or sales comparison methods.

**IV.** Solely with respect to the coverage afforded pursuant to this Supplemental Coverage, Section **VI., EXCLUSIONS,** Section **V., DEFINITIONS**, Subsection **DD.,** of this Policy is hereby deleted in its entirety and replaced with the following:

**DD. "Loss"** means the actual "diminution in value" incurred by a "named insured".

**V.** If the Insurer and the "insured" disagree on the amount of "diminution in value" that is or may be covered pursuant to this endorsement, either may make written demand for an appraisal of such "diminution in value".  In that event, each party shall select a competent and impartial appraiser.  If necessary, the two appraisers shall select an umpire.  If the appraisers cannot agree, either may request that the umpire selection be made by a judge of a court having jurisdiction over the matter.  The appraisers shall state separately the amount of "diminution in value".  If the appraisers fail to agree to a resolution, they shall submit their differences to the umpire.  A decision agreed to by the appraisers, of the umpire, if necessary, shall be binding upon all parties to this Policy.  Each party shall:

**1.** Pay its chosen appraiser; and

**2.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, the Insurer shall still retain all of its rights pursuant to this Policy to deny all or a portion of any "loss".

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**CHUBB**®

# GLOBAL PROGRAM SOLUTIONS (INDEMNITY ONLY OUTSIDE OF THE UNITED STATES) ENDORSEMENT

| Named Insured<br>Vision Service Plan (VSP) | | | Endorsement Number<br>009 |
|---|---|---|---|
| Policy Symbol<br>PPL | Policy Number<br>G71469268 002 | Policy Period<br>12/10/2019  to  12/10/2020 | Effective Date of Endorsement<br>12/10/2019 |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

**I.** Section **IV., COVERAGE TERRITORY,** of this Policy is hereby deleted and replaced with the following:

**COVERAGE TERRITORY**

The coverage afforded pursuant to this Policy shall apply to "pollution conditions" or "indoor environmental conditions" located, and "claims" made, worldwide.

Notwithstanding, this Policy shall not afford coverage for any risk which would otherwise be in violation of the laws of the United States of America, including, but not limited to, economic or trade sanction laws or export control laws administered by the United States Government.

**II. Insuring Agreement**

This Endorsement applies only when a "foreign occurrence" arising out of one or more otherwise covered exposures of the "insured" or "foreign entity" cause injury or damage of a type covered pursuant to this Policy. In that case, rather than directly pay on behalf of the "insured" or "foreign entity", the Insurer shall indemnify the relevant "insured" for the "foreign loss" or "foreign entity loss" caused by a "foreign occurrence" in accordance with this Endorsement.

Nothing in this Endorsement is intended to, nor does it, extend coverage beyond the terms, conditions, exclusions and other limitations of this Policy.

**III. Who is an Insured**

When this Endorsement applies, the general provisions of this Policy that document who is an "insured", including any other associated definitions or schedules, are hereby amended to confirm that "foreign entities" _are_ _not_ "_insured's_" pursuant to this Policy on whose behalf the Insurer has a direct duty to pay settlements or judgments or to whom the Insurer owes any duty to defend.

**IV. Defense and Supplementary Payments**

When this Endorsement applies, rather than directly defend an "insured" or "foreign entity", the Insurer shall indemnify the relevant "insured" for defense costs incurred in defending a "claim" made or brought against it or its "foreign entity", provided that the "insured" complies with the additional conditions of Section VIII. of this Endorsement, below, and all other terms, conditions and limitations of this Policy.

**V. Limits of Insurance**

The insurance provided by this Endorsement is subject to all applicable limits of insurance, limits of liability, deductibles and "self-insured retentions" (if any) identified in the Declarations of, or elsewhere in, this Policy, including any aggregate limits and sublimits (collectively "limits"). Any "foreign loss" or "foreign entity loss" for which the Insurer makes payment pursuant to this Endorsement shall erode and be counted against such limits. Such limits apply on the same basis (e.g., per pollution condition or indoor environmental condition) with respect to the "insureds" as would apply if the "foreign occurrence" has taken place within the United States of America.

**VI.** Section **V., DEFINITIONS,** of this Policy is hereby amended by addition of the following:

**"Biodiversity damages"** means injury to, damage sustained by, or the destruction or loss of, land, air, water, groundwater, drinking water, fish, wildlife, biota and their habitats.

**"Foreign entity"** means:

**1.** The persons or entities identified on the Schedule of Foreign Entities of this Endorsement, if any; and

**2.** Any person or entity which would otherwise qualify as a "insured" as defined in or identified in a coverage part, policy form provision, endorsement or schedule attached to this Policy, but for the fact that such person or entity is domiciled or its principal place of business is located within a jurisdiction outside of the United States of America.

**"Foreign entity loss"** means a "loss" for which a "foreign entity" is legally responsible for payment, and to which Coverages **A., B.** or **C.** of this Policy, or any Supplemental Coverages added to this Policy by endorsement, would otherwise apply if the relevant "insured" were directly liable for such amounts with respect to covered exposures located within the United States of America; provided that such "loss" has not otherwise been paid, indemnified or reimbursed pursuant to any other insurance.

**"Foreign loss"** means a "loss" for which an "insured" is legally responsible for payment, and to which Coverages **A., B.** or **C.** of this Policy, or any Supplemental Coverages added to this Policy by endorsement, would otherwise apply if the relevant "insured" were directly liable for such amounts with respect to covered exposures located within the United States of America; provided that such "loss" has not otherwise been paid, indemnified or reimbursed pursuant to any other insurance.

**"Foreign occurrence"** means a "pollution condition" or "indoor environmental condition" which may result in a "foreign loss" or "foreign entity loss".

**VII.** Section **V., DEFINITIONS,** Subsections **O., JJ.** and **MM.**, of this Policy are hereby deleted and replaced with the following:

**O.** **"Environmental law"** means any international (including European Union), national, Federal, state, commonwealth, provincial, territorial, municipal or other local law, statute, ordinance, rule, guidance document, regulation, and all amendments thereto (collectively Laws), including voluntary cleanup or risk-based corrective action guidance, or the direction of an "environmental professional" acting pursuant to the authority provided by any such Laws, along with any governmental, judicial or administrative order or directive, governing the liability or responsibilities of the "insured" with respect to a "pollution condition" or "indoor environmental condition".

**JJ.** **"Non-owned disposal site"** means:

**1.** Any treatment, storage, transfer, disposal or recycling site or facility located within the United States of America or Canada that has not at any time been owned or operated, in whole or in part, by any "insured", which receives, or has historically received, a "named insured's" waste for disposal; provided that such treatment, storage, transfer, disposal or recycling site or facility:

  **a.** Was properly permitted and licensed pursuant to "environmental law" to accept the "named insured's" waste at the time of such disposal by the Federal, state, commonwealth, provincial, territorial, municipal or other local government agencies or bodies with applicable jurisdiction;

  **b.** Was not owned or operated by any person, corporation or unincorporated association that was in bankruptcy at the time the "named insured's" waste was received for disposal; and

  **c.** Has not, prior to the time the "named insured's" waste was received for disposal, been identified on the United States EPA (CERCLA) National Priorities List or pursuant to any functional equivalent of that list made by Federal, state, commonwealth, provincial, territorial, municipal or other local government agency or body with applicable jurisdiction pursuant to "environmental law", or

**2.** Any treatment, storage, transfer, disposal or recycling site or facility specifically identified on a Schedule of Non-Owned Disposal Sites Endorsement attached to this Policy, if any.

**MM.** **"Property damage"** means:

**1.** Physical injury to, or destruction of, tangible property of a third-party, including all resulting loss of

use of that property;

2. Loss of use of tangible property of a third-party, that is not physically injured or destroyed;

3. Diminished value of tangible property owned by a third-party;

4. "Natural resource damages"; or

5. With respect to "pollution conditions" located within the European Union, "biodiversity damages".

**"Property damage"** does not mean "remediation costs".

**VIII.** Section **IX., GENERAL CONDITIONS**, of this Policy is hereby amended by addition of the following:

### Claims Made and/or Reported Coverage (if applicable)

Any requirements in this Policy that a "claim" be first made and/or reported, or deemed made and/or reported, during the "policy period", or any discovery or "extended reporting period", shall also apply to all "claims" made against a "foreign entity" for which an "insured" seeks indemnification. Any provisions regarding notice of circumstances which may become a "claim" pursuant to this Policy shall apply to circumstances known or which reasonably should have been known by the "insured".

### Additional Duties of the Relevant Insured

1. With respect to a "foreign occurrence" which may result in a "claim" pursuant to this Endorsement, the relevant "insured" assumes the duty to notify the Insurer, and must notify the Insurer in accordance with the standards identified in the applicable coverage form, coverage part or endorsement of this Policy.

2. The relevant "insured" shall, when directed by the Insurer:

   a. Retain in its own name, but at the Insurer's expense, a loss adjusting expert ("loss adjuster") that is authorized in the jurisdiction in which the "foreign loss" or "foreign entity loss" occurred and approved by the Insurer;

   b. Where permitted by applicable law, grant the Insurer the full right to collaborate with such loss adjuster;

   c. Grant the Insurer full access to any records produced by such loss adjuster; and

   d. Obtain the right to control the investigation, adjustment, defense and settlement of the "foreign loss" or "foreign entity loss" using experts approved by the Insurer, including access to books, records, bills, invoices, vouchers and other information.

### Payment as Discharge of Liability

With respect to any "foreign loss" or "foreign entity loss", payment to the relevant "insured" shall, to the extent of such payment and in all circumstances, discharge the Insurer from any liability or alleged liability to any other person or entity, whether or not such person or entity is named as an "insured" pursuant to this Policy.

### Truthfulness and Accuracy of Information

When this Endorsement applies:

1. The relevant "insured" shall make a good faith effort to provide truthful and accurate information to the Insurer with respect to the applicable "foreign entity", "foreign occurrence", "claim", "foreign loss" or "foreign entity loss"; and

2. The relevant "insured" shall not, at any time, intentionally conceal or misrepresent facts concerning this Policy, including the risk to be insured; any "foreign entity"; any "foreign loss"; any "foreign entity loss"; any "claim"; or any "foreign occurrence".

### Schedule of Foreign Entities

1. Dragon Alliance South Pacific PTY LTD.

2. Eyefinity OfficeMate Pty. Ltd. (Australia)

3.      General Optical Pty. Ltd. (Australia)

4.      I Enterprises Pty Ltd. (Australia)

5.      Marchon Eyewear Australia Pty. Ltd.

6.      Monkey Software Pty. Ltd. (Australia)

7.      VSP Global, Inc. (Australia)

8.      FC 18 Comercio e Representacoes, Ltda. (Brazil)

9.      Marchon Brasil, Ltda. (Brazil)

10.     Marchon Canada, Inc.

11.     VSP Vision Canada Inc.

12.     Marchon Eyewear (Hong Kong), Ltd.

13.     Marchon Eyewear (Shanghai), Ltd.

14.     Marchon Eyewear (Shenzhen), Ltd.

15.     Marchon Japan KK

16.     VSP Asia Private Limited

17.     VSP Vision Care (Shanghai) Co., Ltd.

18.     Cristallin SARL (France)

19.     Eyefinity Europe (France)

20.     Eyefinity France (France)

21.     ICP SARL (France)

22.     Marchon France S. A.S.

23.     MyEasySoft SARL (France)

24.     Reflex Holding SAS (France)

25.     Winoptics SARL (France)

26.     Marchon Germany GMBH

27.     Marchon Mauritius Limited

28.     Sterling Meta-Plast India Private Limited (India)

29.     Eyefinity Ireland (Ireland)

30.     Marchon Italia SRL

31.     Coordinadora Administrative Personal, S.A. de R.L. de C.V. (Mexico)

32.     Marchon Europe B.V. (Netherlands)

33.     Marchon Portugal, Unipessoal, Lda.

34.     Marchon Singapore Pte. Limited

35.     Marchon Hispania S.L. (Spain)

36.     Scandinavian Eyewear AB

37.     Enternasyonal Gozluk Sanay VE Ticaret AS- DBA Marchon Turkey

38.     Marchon Gulf FZE (UAE)

**39.**      Marchon UK, Ltd.

**40.**      VSP Vision Care UK, Ltd. (UK)

**41.**      Corporacion Optica Internacional SRL DBA Marchon Mexico

All other terms and conditions of this Policy remain unchanged.


_____
Authorized Representative

## NOTICE OF CANCELLATION AMENDATORY (GENERIC TIME FRAME) ENDORSEMENT

| Named Insured<br>Vision Service Plan (VSP) | | | Endorsement Number<br>010 |
|---|---|---|---|
| Policy Symbol<br>PPL | Policy Number<br>G71469268 002 | Policy Period<br>12/10/2019  to  12/10/2020 | Effective Date of Endorsement<br>12/10/2019 |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

Section **IX.**, **GENERAL CONDITIONS**, Subsection **A.**, **Cancellation**, Paragraph **2.**, of this Policy is hereby deleted in its entirety and replaced with the following:

**2.**   This Policy may be cancelled by the Insurer for the following reasons:

**a.**   Non-payment of premium; or

**b.**   Fraud or material misrepresentation on the part of any "insured",

by mailing to the "first named insured" at the "first named insured's" last known address, written notice stating when, not less than ninety  (90 ) days thereafter, fifteen (15) days if cancellation is for non-payment of any unpaid portion of the premium, such cancellation shall be effective. The mailing of notice shall be sufficient proof of notice. The effective date and hour of cancellation stated in the notice shall be the end of the "policy period".

Subparagraph **2.b.**, herein, shall apply only to that "insured" that engages in the fraud or misrepresentation.   This exception shall not apply to any "insured" who is a parent corporation, subsidiary, employer of, or otherwise affiliated by ownership with, such "insured".

All other terms and conditions of the Policy remain unchanged.

_____
Authorized Representative

## OTHER INSURANCE (PRIMARY) ENDORSEMENT

| Named Insured<br>Vision Service Plan (VSP) | | | Endorsement Number<br>011 |
|---|---|---|---|
| Policy Symbol<br>PPL | Policy Number<br>G71469268 002 | Policy Period<br>12/10/2019  to  12/10/2020 | Effective Date of Endorsement<br>12/10/2019 |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

Section **IX.**, **GENERAL CONDITIONS**, Subsection **H.**, **Other Insurance**, of this Policy is hereby deleted in its entirety and replaced with the following:

**H.  Other Insurance**

If other valid and collectible insurance is available to the "insured" covering any exposure also covered by this Policy, the insurance afforded by this Policy shall apply as primary insurance.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

## PREMIUM EARN-OUT (STAGGERED – ONE YEAR – ACCELERATION) ENDORSEMENT

| Named Insured<br>Vision Service Plan (VSP) | | | Endorsement Number<br>012 |
|---|---|---|---|
| Policy Symbol<br>PPL | Policy Number<br>G71469268 002 | Policy Period<br>12/10/2019  to  12/10/2020 | Effective Date of Endorsement<br>12/10/2019 |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

Section **IX., GENERAL CONDITIONS,** Subsection **A., Cancellation,** Paragraph **3.,** of this Policy is hereby deleted in its entirety and replaced with the following:

**3.** Premium Earn-Out

**a.** Subject to Subparagraph **b.,** below, in the event of cancellation, twenty-five percent (25 %) of the premium identified in Item **6.** of the Declarations shall be minimum earned upon the inception date identified in Item **2.** of the Declarations.  Thereafter, the remaining premium shall be deemed earned by the Insurer on a *pro rata* basis over the first year of the "policy period".

**b.** In the event a "claim" is first made against an "insured", or a "pollution condition" or "indoor environmental condition" is first discovered by an "insured", during the "policy period", to which this insurance may apply, in whole or in part, the premium identified in Item **6.** of the Declarations shall be immediately deemed one hundred percent (100%) earned upon such event.

Subject to the foregoing, any unearned premium amounts due the "first named insured", if any, shall be refunded within thirty (30) days of the effective date of cancellation.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

# SCHEDULE OF COVERED LOCATIONS ENDORSEMENT

| Named Insured<br>Vision Service Plan (VSP) | | | Endorsement Number<br>013 |
|---|---|---|---|
| Policy Symbol<br>PPL | Policy Number<br>G71469268 002 | Policy Period<br>12/10/2019  to  12/10/2020 | Effective Date of Endorsement<br>12/10/2019 |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

The locations identified in the Schedule of Covered Locations, below, are hereby added to this Policy as additional "covered locations".

### SCHEDULE OF COVERED LOCATIONS

| | *Location* | *Retroactive Date* |
|---|---|---|
| **1.** | 112 Inverness Drive East, Suite D, Englewood, CO 80112 | 11/19/2018 |
| **2.** | 1920 Starita Road, Suite G Charlotte NC 28269 | 11/19/2018 |
| **4.** | 2651 La Mirada Drive, Suites 100 & 110 Vista CA 92081 | 11/19/2018 |
| **5.** | 3375 Koapaka Street, Suite B292, Honolulu HI 96819 | 11/19/2018 |
| **6.** | 3900 Roosevelt Road, Suite 111 & 110 St. Cloud MN 56301 | 11/19/2018 |
| **7.** | 3922 Vero Road, Ste. M Baltimore MD 21227 | 11/19/2018 |
| **8.** | 440 East Vista Ridge Mall Drive Lewisville TX 75067 | 11/19/2018 |
| **9.** | 4540 Kendrick Plaza Drive, Suite 140 Houston TX 77032 | 11/19/2018 |
| **10.** | 5600 115th Avenue North Clearwater FL 33760 | 11/19/2018 |
| **11.** | 6611 N.W. 15th Way Fort Lauderdale FL 33309 | 11/19/2018 |
| **12.** | 8719 Commerce Place Drive Lacey WA 98513 | 11/19/2018 |
| **13.** | 151 Blue Ravine Road Folsom CA 95630 | 11/19/2018 |
| **14.** | 2400 Spiegel Drive, Suite A Groveport OH 43125 | 11/19/2018 |
| **15.** | 2605 Rohr Road Lockbourne OH 43137 | 11/19/2018 |
| **16.** | Viale Alpago, 151 Loc Bastia 32015, , Italy Puos d'Alpago, Province of Belluno Italy | 11/19/2018 |
| **17.** | 6601 Guada Coma Drive, Schertz, TX 78154 | 12/10/2019 |
| **18.** | 655 Richland Hills Drive | 12/10/2019 |
| **19.** | 24844 Avenue Rockefeller Santa Clarita CA; Retro 91355 | 11/19/2018 |

If a "covered location", above, is identified with a corresponding Retroactive Date, then that date shall supersede the general Retroactive Date identified for premises coverage afforded pursuant to Coverage **A.** within Item **5.** of

the Declarations to this Policy for "pollution conditions" on, at under or migrating from, or "indoor environmental conditions" at, that specific "covered location".  Also, if a "covered location", above, is identified with the phrase **"FULL RETRO"**, then full retroactive coverage is afforded pursuant to this Policy for "pollution conditions" on, at under or migrating from, or "indoor environmental conditions" at, that specific "covered location".  Notwithstanding the foregoing, any retroactive coverage indicated herein is subject to any other exposure-specific Retroactive Date added to this Policy by endorsement.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

## SUPPLEMENTARY PAYMENTS AMENDATORY ENDORSEMENT

| Named Insured<br>Vision Service Plan (VSP) | | | Endorsement Number<br>014 |
|---|---|---|---|
| Policy Symbol<br>PPL | Policy Number<br>G71469268 002 | Policy Period<br>12/10/2019  to  12/10/2020 | Effective Date of Endorsement<br>12/10/2019 |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

Section **IX., GENERAL CONDITIONS**, of this Policy is hereby amended by addition of the following:

**Supplementary Payments**

With respect to any covered "claim" or "first-party claim" that the Insurer investigates, settles or defends pursuant to this Policy, the insurer shall pay for:

**1.** All internal expenses incurred by the Insurer;

**2.** All reasonable expenses incurred by an "insured" at our request to assist us in the investigation, settlement or defense of any "claim" or "first-party claim" including loss of earnings up to the aggregate amount of **five thousand dollars ($5,000)** per "pollution condition" or "indoor environmental condition" because of time off from work; and

**3.** All court costs taxed against the "insured" in a suit, but such costs shall not include attorneys' fees or attorneys' expenses taxed against the "insured"; and

The Supplementary Payments identified above shall not be subject to the "self-insured retention" of this Policy, but shall, with the exception of internal expenses incurred by the Insurer in Paragraph **1.**, above, reduce and erode the Limits of Liability discussed in Section **II., LIMITS OF LIABILITY AND SELF-INSURED RETENTION**, Subsections **D., E.** and **F.**, of this Policy.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

# SERVICE OF SUIT ENDORSEMENT

| Named Insured<br>Vision Service Plan (VSP) | | | Endorsement Number<br>015 |
|---|---|---|---|
| Policy Symbol<br>PPL | Policy Number<br>G71469268 002 | Policy Period<br>12/10/2019  to  12/10/2020 | Effective Date of Endorsement<br>12/10/2019 |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

Information about service of suits upon the company is given below. Service of process of suits against the company may be made upon the following person, or another person the company may designate:

> Mr. Paul Bech, Esq., Assistant General Counsel
> Chubb
> 436 Walnut Street
> Philadelphia, PA 19106-3703

The person named above is authorized and directed to accept service of process on the company's behalf in any action, suit or proceeding instituted against the company. If the insured requests, the company will give the insured a written promise that a general appearance will be entered on the company's behalf if a suit is brought.

If the insured requests, the company will submit to the jurisdiction of any court of competent jurisdiction. The company will accept the final decision of that court or any Appellate Court in the event of an appeal.  However, nothing in this endorsement constitutes a waiver of the company's right to: remove an action to a United States District Court, seek a transfer of a case to another court, or to enforce policy provisions governing choice of law or venue selection, as may be permitted by the laws of the United States, or of any state in the United States.

The law of some jurisdictions of the United States of America requires that the Superintendent, Commissioner or Director of Insurance (or their successor in office) be designated as the company's agent for service of process. In these jurisdictions, the company designates the Director of Insurance as the company's true and lawful attorney upon whom service of process on the company's behalf may be made. The company also authorizes the Director of Insurance to mail process received on the company's behalf to the company person named above.

If the insured is a resident of Canada, the insured may also serve suit upon the company by serving the government official designated by the law of the insured's province.

NOTHING HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE POLICY TO WHICH THIS ENDORSEMENT IS ATTACHED OTHER THAN AS ABOVE STATED.

_____
Authorized Representative

## TRADE OR ECONOMIC SANCTIONS ENDORSEMENT

| Named Insured<br>Vision Service Plan (VSP) | | Endorsement Number<br>016 |
|---|---|---|

| Policy Symbol<br>PPL | Policy Number<br>G71469268 002 | Policy Period<br>12/10/2019  to  12/10/2020 | Effective Date of Endorsement<br>12/10/2019 |
|---|---|---|---|

| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company |
|---|

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This insurance does not apply to the extent that trade or economic sanctions or other laws or regulations prohibit us from providing insurance, including, but not limited to, the payment of claims. All other terms and conditions of the policy remain unchanged.

_____
Authorized Representative

# SIGNATURES

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| Vision Service Plan (VSP) | | | 017 |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| PPL | G71469268 002 | 12/10/2019 to 12/10/2020 | 12/10/2019 |

| Issued By (Name of Insurance Company) |
|---|
| Illinois Union Insurance Company |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

THE ONLY SIGNATURES APPLICABLE TO THIS POLICY ARE THOSE REPRESENTING THE COMPANY NAMED ON THE FIRST PAGE OF THE DECLARATIONS.

By signing and delivering the policy to you, we state that it is a valid contract.

**ILLINOIS UNION INSURANCE COMPANY** (A stock company)
525 W. Monroe Street, Suite 400, Chicago, Illinois 60661

**WESTCHESTER SURPLUS LINES INSURANCE COMPANY** (A stock company)
Royal Centre Two, 11575 Great Oaks Way, Suite 200, Alpharetta, GA 30022

REBECCA L. COLLINS, Secretary

JOHN J. LUPICA, President
Authorized Representative

Chubb. Insured.℠

C H U B B°

[X] **Illinois Union Insurance  Company**

[ ] **Westchester Surplus Lines Insurance Company**

[ ] .

Insured:
Vision Service Plan (VSP)

Attached To Policy No.:  PPL G71469268 002

Effective Date:  12/10/2019

---

### CALIFORNIA SURPLUS LINES NOTIFICATION
## NOTICE:

**1. THE INSURANCE POLICY THAT YOU (HAVE PURCHASED) (ARE APPLYING TO PURCHASE) IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA. THESE COMPANIES ARE CALLED "NONADMITTED" OR "SURPLUS LINE" INSURERS.**

**2. THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT THAT APPLY TO CALIFORNIA LICENSED INSURERS.**

**3. THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW. THEREFORE, THESE FUNDS WILL NOT  PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE   INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE     PAYMENTS AS PROMISED.**

**4. THE INSURER SHOULD BE LICENSED EITHER AS A FOREIGN INSURER IN ANOTHER STATE IN THE UNITED STATES OR AS A NON-UNITED STATES (ALIEN) INSURER. YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE AT THE FOLLOWING TOLL-FREE TELEPHONE NUMBER: 1-800-927-4357 OR INTERNET WEB SITE WWW.INSURANCE.CA.GOV. ASK WHETHER OR NOT THE INSURER IS LICENSED AS A FOREIGN OR NON-UNITED STATES (ALIEN) INSURER AND FOR ADDITIONAL INFORMATION ABOUT THE INSURER. YOU MAY ALSO CONTACT THE NAIC'S INTERNET WEB SITE AT WWW.NAIC.ORG.**

5. **FOREIGN INSURERS SHOULD BE LICENSED BY A STATE IN THE UNITED STATES AND YOU MAY CONTACT THAT STATE'S DEPARTMENT OF INSURANCE TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.**

6. **FOR NON-UNITED STATES (ALIEN) INSURERS, THE INSURER SHOULD BE LICENSED BY A COUNTRY OUTSIDE OF THE UNITED STATES AND SHOULD BE ON THE NAIC'S INTERNATIONAL INSURERS DEPARTMENT (IID) LISTING OF APPROVED NONADMITTED NON-UNITED STATES INSURERS. ASK YOUR AGENT, BROKER, OR "SURPLUS LINE" BROKER TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.**

7. **CALIFORNIA MAINTAINS A LIST OF ELIGIBLE SURPLUS LINE INSURERS. ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THAT LIST, OR VIEW THAT LIST AT THE INTERNET WEB SITE OF THE CALIFORNIA DEPARTMENT OF INSURANCE: WWW.INSURANCE.CA.GOV.**

8. **IF YOU, AS THE APPLICANT, REQUIRED THAT THE INSURANCE POLICY YOU HAVE PURCHASED BE BOUND IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE THIS DISCLOSURE FORM AND A REQUEST FOR YOUR SIGNATURE UNTIL AFTER COVERAGE BECAME EFFECTIVE, YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE DAYS OF RECEIVING THIS DISCLOSURE.  IF YOU CANCEL COVERAGE, THE PREMIUM WILL BE PRORATED AND ANY BROKER'S FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU.**

Applicant Signature _____Date _____

NOTHING HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE POLICY TO WHICH THIS NOTICE IS ATTACHED OTHER THAN AS STATED ABOVE.

**CHUBB**®

| | |
|---|---|
| Illinois Union Insurance Company | |
| *Insurance Company* | |
| Vision Service Plan (VSP) | |
| *Policyholder* | |
| PPL G71469268 002 | |
| *Policy Number* | |
| Lockton Insurance Brokers LLC | |
| *Broker/Producer* | |

## POLICYHOLDER DISCLOSURE
## NOTICE OF TERRORISM INSURANCE COVERAGE

You were notified that under the Terrorism Risk Insurance Act, as amended, you have a right to purchase insurance coverage for losses resulting from acts of terrorism. *As defined in Section 102(1) of the Act*: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury---in consultation with the Secretary of Homeland Security, and the Attorney General of the United States---to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**YOU SHOULD KNOW THAT WHERE COVERAGE IS PROVIDED BY YOUR POLICY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS. UNDER THE FORMULA, THE UNITED STATES GOVERNMENT GENERALLY REIMBURSES 85% FOR YEAR 2015, 84% BEGINNING ON JANUARY 1, 2016; 83% BEGINNING ON JANUARY 1, 2017, 82% BEGINNING ON JANUARY 1, 2018; 81% BEGINNING ON JANUARY 1, 2019 AND 80% BEGINNING ON JANUARY 1, 2020, OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. THE PREMIUM THAT WOULD BE CHARGED FOR THIS COVERAGE IS PROVIDED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS THAT MAY BE COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.**

**YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED.**

You elected ***NOT*** to purchase terrorism coverage under the Act at the price indicated. ACCORDINGLY, WE WILL ***NOT*** PROVIDE THIS COVERAGE AND YOU DO NOT OWE THE ADDITIONAL PREMIUM FOR THAT COVERAGE INDICATED BELOW.

> Terrorism coverage described by the Act under your policy was made available to you for additional premium in the amount of $1,369 , however you elected to decline such coverage.



### Chubb Producer Compensation
### Practices & Policies

Chubb believes that policyholders should have access to information about Chubb's practices and policies related to the payment of compensation to brokers and independent agents. You can obtain that information by accessing our website at http://www.chubbproducercompensation.com or by calling the following toll-free telephone number: 1-866-512-2862.

IL P 001 01 04

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

 © ISO Properties, Inc., 2004